240 N.J. Super. 412 (1990)
573 A.2d 505
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DARNELL WARD, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted: January 31, 1990.
Decided April 30, 1990.
*414 Before Judges KING, BAIME and KEEFE.
Thomas S. Smith, Jr., Acting Public Defender, attorney for appellant (Theodore E. Kyles, Jr., Designated Counsel, of counsel and on the letter brief).
Robert J. Del Tufo, Attorney General of New Jersey, attorney for respondent (Janet Flanagan, Deputy Attorney General, of counsel).
The opinion of the court was delivered by KING, P.J.A.D.
The issue in this case is whether defendant was subjected to the functional equivalent of interrogation in violation of his Miranda[1] rights. Defendant was found guilty of armed robbery and related offenses after a jury trial. He received a prison term of 15 years with a five-year period of parole ineligibility because of the Graves Act, N.J.S.A. 2C:43-6 d. He contends that the admission into evidence of a statement made while he was in custody violated his Miranda rights. We agree and reverse.
The robbery with which defendant was charged occurred at about 7:30 p.m. on May 8, 1986 at Quick Charlie's Mini Market *415 at 658 Sanford Avenue, in the Vailsburg section of Newark. Three males, defendant, codefendant Kevin Miller and S.S. (a juvenile) were suspects in the robbery. The victims gave the police certain information about the suspects and the getaway car. A chase ensued and Miller and S.S. were caught. The police claim that defendant-appellant Ward fled and avoided apprehension. Inside the car used by the fleeing suspects, the police found the proceeds of the robbery. Along the escape route they found the discarded weapon used in the holdup. Norris, a victim, identified Miller and S.S. at the scene of their apprehension and again at the police station.
When police interrogated the adult codefendant Miller, he implicated defendant-appellant Ward in the robbery. Another victim of the robbery then identified defendant Ward in a photographic lineup prepared by the police.
On May 14 Detective Scott-Bey found out that defendant was in custody on another, unrelated charge. He went to defendant's jail cell as part of his investigation. The Detective already had Kevin Miller's statement implicating defendant-appellant Ward in the robbery of Quick Charlie's Mini Market on May 8. Thus, defendant Ward was definitely a suspect at that time.
In the cell block Detective Scott-Bey showed defendant the pictures of "the other two individuals that were charged with the particular crime," i.e., Miller and S.S. At the same time he showed the pictures to defendant he told him about the robbery charge being made against him and "where the occurrence of this incident was. I said that these two individuals were also arrested." No Miranda warnings were given to defendant before this statement by the Detective. Nor did Detective Scott-Bey ask defendant any questions.
This is precisely how the Detective described the event.
Q After you gave him the warnings and he stated the names of the two individuals?

*416 A No, he had told me what he did. I told him the place of the occurrence, everything. I put two pictures down in front of him. I told him these two guys were arrested and, "You are going to be charged with the robbery that occurred at Quick Charlie's."
Looking at the picture he said, "I don't know Kevin Miller and [S.S.]."
All right, I said, "Well, I will advise you of your constitutional rights."
He said he is not signing anything; he does not know anything about a robbery. [Emphasis supplied.]
When shown the photographs in this fashion, defendant specifically said: "I don't know Kevin Miller and [S.S.]." Only then was he given his constitutional Miranda warnings; he refused to sign a written waiver or anything else, and denied knowledge of any robbery. The Detective had not told the defendant the names of the two men in the pictures and did not ask defendant any questions. He just showed him the pictures; defendant volunteered the suspects' names but denied "knowing" the individuals. Defendant did not testify at trial.
We conclude from this record that the statement obtained from defendant was voluntary. But we also conclude that defendant had neither received nor waived his Miranda rights when he blurted out "I don't know Kevin Miller and [S.S.]," after being told about the robbery and that he had been charged in it, and after being shown the two pictures of his alleged cohorts. Later, after having been informed of his Miranda rights and refusing to make a statement, defendant did tell Detective Scott-Bey that he knew where the store was and that his father lived in the neighborhood. Still, he insisted that he knew nothing about the robbery.
The trial judge found no Miranda violation at the time of the preliminary examination. See Evid.R. 8(1). He also found that defendant "voluntarily gave their names" prior to being warned. He concluded:
I find that the statement, which is the only thing that I would find to be damaging to him, would be the fact that he knew the co-defendants. I think that was a voluntary statement, in that it is admissible without having to give a Miranda warning, since the detective was in the process of alerting the defendant to the charges against him at that time.
I will permit the statements to be admitted.
*417 The trial judge apparently was satisfied that the statement by defendant was not the product of interrogation. We are not. We conclude that the Detective's confrontation with defendant was the functional equivalent of an interrogation; his response was not simply a spontaneous outburst elicited casually or innocently without the State's purposeful enticement or encouragement.
The custodial circumstance of the confrontation was inherently coercive. Miranda v. Arizona, 384 U.S. at 457-458, 86 S.Ct. at 1618-1619. As the judge describes in his findings,
Det. Scott-Bey indicates that apparently Mr. Ward was a suspect at the time. He indicated he believed Mr. Ward was arrested on an unrelated matter; but he was in a cellblock on Green Street; went down to talk to him at that time and did advise Mr. Ward, according to Det. Scott-Bey, that he might have been a suspect. At least he was aware that he was a suspect in the robbery at that time.
He showed him two photographs, apparently of Miller and [S.S.], Kevin Miller at that time. He did not advise Mr. Ward at that time of his rights. Obviously he had an obligation to tell Mr. Ward what he was being asked about. He showed him some photographs. Mr. Ward indicated he did not know the two individuals, but then gave their names at that time. Frankly I find that to be voluntary at that particular time. I do not find any problem in the detective asking him or advising him of the nature of the offenses, and asking him whether he knew these two individuals that he indicated no, but voluntarily gave their names. So for whatever value it is worth, I think it is admissible.
The test in this case is whether "a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 303, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980). The compulsion inherent in Detective Scott-Bey's cellblock confrontation with the unwarned suspect was greater than the "subtle compulsion" which the federal Supreme Court condoned in Innis, a conversation between police officers in a police cruiser in the defendant's presence. We are mindful that "the modern practice of in-custody interrogation is psychologically rather than physically oriented." Miranda v. Arizona, 384 U.S. at 448, 86 S.Ct. at 1614.
*418 As the Supreme Court said in Innis, interrogation can occur by other means than simple questioning:
It is clear therefore that the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. "Interrogation," as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.
We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. [446 U.S. at 300-302, 100 S.Ct. at 1689-1690.]
By "incriminating response," the High Court meant "any response  whether inculpatory or exculpatory  that the prosecution may seek to introduce at trial." Rhode Island v. Innis, 446 U.S. at 301 n. 5, 100 S.Ct. at 1690 n. 5.
We believe the the Detective's undertaking here was designed to elicit a response, both helpful to the investigation and incriminatory of his suspect. His attempt succeeded, in part. Defendant should have been given the Miranda warnings before, not after, the Detective started the process so clearly designed to entangle the defendant in the criminal event.
Our Supreme Court acknowledged the Innis "functional equivalent of interrogation" rule in State v. Bey, 112 N.J. 45, 548 A.2d 846 (1988), and said that "the initiation of a general discussion about the victim clearly satisfies the standard." 112 N.J. at 68 n. 3, 548 A.2d 846, citing Christopher v. Florida, 824 F.2d 836, 845 (11th Cir.1987) (a generalized discussion relating *419 to investigation constitutes interrogation). In Christopher, the Eleventh Circuit said that the police may not ask questions or make statements which open up a more generalized discussion relating directly or indirectly to the investigation. 824 F.2d at 845. See also Anderson v. Smith, 751 F.2d 96, 105 (2nd Cir.1984), and State v. Coles, 28 Wash. App. 563, 564-570, 625 P.2d 713, 715-717 (1981), also cited in State v. Bey, 112 N.J. at 68 n. 13, 548 A.2d 846. The Detective's approach to defendant in his cell in the case before us was far from the "casual remark" about wearing glasses which we condoned in State v. Ramos, 217 N.J. Super. 530, 537, 526 A.2d 284 (App.Div. 1987); see also State v. Marks, 201 N.J. Super. 514, 528, 493 A.2d 596 (App.Div. 1985) (defendant's expression of surprise when notified of arrest not in response to a question).
We conclude that defendant's Miranda rights were "not scrupulously honored," State v. Bey, 112 N.J. at 69 n. 14, 548 A.2d 846, as required, when he was confronted in his cell by the Detective in charge of the robbery investigation, told of the robbery and of the formal charge against him, and then shown the pictures. A scrupulous respect for defendant's rights would have required giving him the warnings right away, before the Detective embarked on his accusatory task. We do not intend our ruling here to preclude the admission into evidence of any statement that is voluntarily blurted out by an accused in custody where the police have not subjected him to an interrogative technique or where the police are about to begin giving the Miranda warnings. Such statements are volunteered and are admissible without Miranda warnings. See Miranda v. Arizona, 384 U.S. at 478-479, 86 S.Ct. at 1629-1630. We do not so construe the record here. We conclude that this defendant's statement was not volunteered.
We also reject the State's argument that defendant's statement was not prejudicial to him, or that if prejudicial, the constitutional error was harmless beyond any reasonable doubt. We have no doubt that defendant's admission, used at trial, that *420 he knew the two suspects by name, had the capacity to link him to them in the jury's mind even though he claimed that he "didn't know them." Any reliable evidence linking defendant to the two, Miller and S.S., had to damage defendant in the jury's eyes.
Reversed.
NOTES
[1] 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).