833 A.2d 640 (2003)
363 N.J. Super. 442
STATE of New Jersey, Plaintiff-Respondent,
v.
John F. CRYAN, Jr., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 22, 2003.
Decided October 27, 2003.
*641 James E. Trabilsy, Woodbridge, argued the cause for appellant (Wilentz, Goldman & Spitzer, attorneys; Mr. Trabilsy, of counsel and on the brief; Ellen Torregrossa O'Connor on the brief).
Anthony Fazioli, Assistant Prosecutor, argued the cause for respondent (Wayne J. Forrest, Somerset County Prosecutor, attorney; Mr. Fazioli, on the brief).
Before Judges PETRELLA,[1] WEFING and FUENTES.
The opinion of the court was delivered by FUENTES, J.A.D.
Defendant John F. Cryan, Jr., was tried and convicted of driving while under the influence of alcohol (DWI), N.J.S.A. 39:4-50(a) and reckless driving, N.J.S.A. 39:4-96 in the Bedminster Municipal Court. He was again convicted in a trial de novo in the Law Division. R. 3:23-8. Defendant was assessed the mandatory fines and penalties, ordered to complete twelve hours at an Intoxicated Driver's Resource Center and his driving privileges were revoked for a period of six months.
The following facts were developed from the evidence presented at trial.

I
On August 14, 2001, at approximately 2:00 a.m., defendant was involved in an automobile accident when he crashed his car into a tree. The collision rendered the vehicle inoperable. When Officer Marjorie Cooper and Sergeant Karl Rock of the Bedminster Police Department arrived at the scene, defendant's vehicle was in the center of the road. The car's driver's side door was heavily damaged. The air bags were deployed and the car horn was sounding.
Defendant was seated behind the steering wheel. He was bleeding from a cut on his lip, was disoriented and complained of pain on the left side of his body. Officer Cooper noted that his eyes were red and watery. Sergeant Rock smelled an odor of alcoholic beverage emanating from inside defendant's vehicle. Cooper detected a similar odor emanating from defendant's person. Defendant denied he had been drinking that evening.
Defendant was placed inside an ambulance where he received first aid for his injuries. Although the paramedic at the scene also detected an odor of alcoholic beverage on defendant's breath, there was nothing in defendant's demeanor, i.e., his speech, gait, level of cooperation, that was consistent with intoxication.
Officer Cooper suspected, based on the odor of alcohol, that defendant was under the influence of alcohol, and thus directed him to perform two separate field sobriety tests. The first was the finger dexterity test. Cooper described this test as follows:
I asked him to touch his thumb to each finger and count out loud as I was doing it. I wanted him to go one, two, three, *642 four and then count backwards, touching each finger, four, three, two one. I told him to touch the tips of his fingers and not in between or not the pattern down here, as to touch each tip as he counted. And I demonstrated it one more time, one, two, three, four, four, three, two, one. I asked him to do that five times and stop when he's done.
According to Cooper, defendant failed this test by failing to touch his thumb to his fingertip and only performing the test three times.
The second test involved reciting the alphabet. Cooper instructed defendant to recite the alphabet commencing with the letter "D" and stopping at the letter "S." Once again defendant failed to follow Cooper's instructions. He recited more of the alphabet than requested and placed the letters in the wrong order. His speech was slurred and his words were mumbled. Based on the results of these tests Cooper concluded that defendant was under the influence of alcohol. She once again asked defendant whether he had been drinking. This time, according to Cooper, defendant admitted he had had three or four drinks. He also told Cooper that he was a diabetic and was not feeling well.
After consulting with Sergeant Rock, Cooper advised defendant that he was under arrest for DWI. Defendant then indicated that he wanted to be taken by ambulance to the hospital for medical treatment. However, while in the ambulance, defendant refused all attempts to provide him with medical care. In fact, according to the paramedic, defendant said that he only came into the ambulance "to get away from the police."
At some point thereafter, defendant exited the ambulance and approached Sergeant Rock and told him he did not want any medical attention. Sergeant Rock determined that because of defendant's injury to his lip he could not administer a breathalyzer test. He therefore decided to transport defendant to the Somerset Medical Center to obtain a sample of his blood for blood alcohol content (BAC) analysis.
Before he was taken away, defendant told Officer Cooper that he wanted to speak to her alone. Cooper advised defendant that Sergeant Rock needed to be present during this conversation. It is not disputed that at this point in time defendant was under arrest and had not been given Miranda warnings.[2] When Sergeant Rock joined Cooper he told defendant: "There is nothing to talk about." Notwithstanding this reproach, defendant asked Rock to give him "a break." When both Cooper and Rock failed to respond to this unsolicited statement, defendant called Sergeant Rock an "asshole."
Defendant was handcuffed and transported to the hospital by Officer Cooper in a police patrol car. While en route, defendant continued making unsolicited statements to Cooper. He wondered out loud why he was being treated so severely because: "it was drunk driving, not some big crime." He also called Cooper an "asshole" and said she just wanted "to screw him" for making one mistake.
Upon arriving at the hospital, defendant exited the police car and walked into the hospital without any apparent difficulty. While at the hospital, defendant permitted the medical staff to prick his finger to extract a sample of his blood for glucose level analysis. However, he refused to *643 permit the same medical personnel to obtain a larger sample of his blood for BAC analysis.
At approximately 3:00 a.m., defendant demanded to speak to a police supervisor. Lieutenant William Stephens approached defendant in response and stated: "What can I do for you?[3]" According to Stephens, defendant stated that he felt very uncomfortable with his situation. He repeatedly expressed his belief that Officer Cooper was "trying to stick it up his ass." He also indicated that he had recently donated $20,000 to a charitable cause and did not believe that he warranted the type of treatment he had received thus far from the police. He also expressed concern over his wife's potential reaction to his DWI arrest. Finally, defendant told Stephens that he had given Officer Cooper "all his PBA cards" in an unsuccessful attempt to dissuade her from pursuing the DWI case against him.
Concerning his cooperation with the medical staff's efforts to obtain a sample of his blood for BAC analysis, defendant repeatedly told Stephens that he would not cooperate because he was afraid of needles. This exchange between defendant and Stephens took approximately fifteen to twenty minutes. It is undisputed that Stephens did not advise defendant of his rights under Miranda. It is equally undisputed that Stephens's purpose at the hospital was to notarize the medical certificate required under N.J.S.A. 2A:62A-11, and not to elicit information from defendant. This was made clear in the following exchange between the Municipal Court Judge and counsel:
PROSECUTOR: Thank you, Judge. There are some thing[s] that I can add with regard to our recent conversation with Lieutenant Stephens. And that is that he told us that his purpose there was solely for the drawing of blood, that he was not there to elicit information, nor did he attempt to elicit any information. He did not ask any questions. He was not seeking to elicit any information.
THE COURT: Is thatdo you agree on that?
DEFENSE COUNSEL: That's what correct, that's what Stephens had told us
THE COURT: Okay.
DEFENSE COUNSEL:off the record,[4] which we are not disputing.
THE COURT: All right, that's helpful
DEFENSE COUNSEL: Yeah.
The State also called the emergency room physician who treated defendant for his injuries. This witness testified that defendant's injuries to his lip required stitches. Prior to commencement of treatment, defendant was given a local anesthetic which was administered through an injection directly in the area of the wound. The doctor did not recall defendant objecting to the use of needles.
After the treatment was completed, defendant told Officer Cooper that he wanted to leave the hospital. While en route to police headquarters in Cooper's police car, defendant complained to Cooper of pain in his rib cage. He was then placed in Lieutenant Stephens's police car for transport back to Somerset Medical Center. While on the way back to the hospital, Stephens had to stop to permit defendant to urinate in some bushes nearby. Stephens noted *644 that defendant swayed while urinating, requiring Stephens to place his hand on defendant's back to stop him from falling.
Once they arrived at the hospital grounds, defendant again requested to exit the police vehicle. This time defendant vomited by the side of the hospital entrance. Stephens noted that defendant's vomit had a strong odor of alcoholic beverage. Officer Cooper remained by defendant's side when he was readmitted to the hospital. According to Cooper[5], defendant made the following unsolicited comments to her:
We readmitted John [defendant] back into Somerset Medical Center. He was seated back in a chair. The defendant then advised that he was sorry he treated me the way he did. I explained to John that it was okay and again told him that I was doing my job. The defendant then advised that he could not afford to get a DWI because he was applying for another liquor license. John advised me he did not know how we could charge him of driving while intoxicated if he did not give blood.
Defendant was again examined and treated by hospital staff and released into the care of a friend.
At trial, defendant called as an expert witness Dr. Wanda Ryan, a board certified endocrinologist who treats him for diabetes. Dr. Ryan explained that defendant suffers from type one diabetes, a condition which causes chronically elevated sugar levels in the blood. In defendant's case, this is treated with insulin injections and dietary restrictions. At the time he was first admitted at Somerset Medical Center, defendant had a blood sugar level of 447. A normal blood sugar level ranges between 70 and 110.
Dr. Ryan gave the following explanation of the medical significance of this blood sugar reading:
You know, I think certainly with an elevated blood sugar to that degree you will have symptoms often of blurry vision. You can have dizziness, you can have nausea. You can have vomiting. You can have increased thirst and urination. I think you can, you know, following a traumatic incident, have certainly confusion, difficulty concentrating. I think following a traumatic event there is production of a lot of a counter regulatory hormones that further drive up the blood sugar and counter the effects of insulin and can increase potential for developing diabetic ketoacidosis[6] in that setting.
Defendant also testified on his own behalf. He stated that he monitors his daily blood sugar levels by pricking his finger and extracting a blood sample which he collects with a specially coated strip. He then inserts the strip into a machine which reads it and digitally displays his blood sugar reading. He treats his diabetes by injecting himself with insulin three times each day.
On the day of the accident, he worked at his restaurant until 2:00 a.m. He began work earlier the day before and returned to work at nine o'clock in the evening after going home for three or four hours. The work consisted, in part, of organizing the stock in the restaurant, including coming into contact with kegs of beer. This, according *645 to defendant, may have caused the odor of alcoholic beverage detected by the police. He admitted, however, to drinking a sixteen-ounce glass of beer around 9:00 p.m. He did not administer his daily third insulin injection before leaving the restaurant.
He gave the following description of how the accident occurred:
A. This nightthis particular night was extremely foggy out. And visibility was very, veryI felt it was very, very bad. And that area right there unfortunately gets extremely bad at thatit's like a haze that flows over theseit's like a farmland right there, big horse
Q. Which area now, so the record is clear?
A. The area on Lamington Road going towards 78.
Q. Okay. Is it still Lamington Road or it's the Rattlesnake Bridge Road?
A. Iyou, know, I'm notI'm really not sure.
Q. Are they the same road, it just changes
A. Yes, it's exactly the same road.
Q. Okay. It just changes names?
A. Yes.
Q. Okay. So explainyou left the bar. It was foggy. And you left by yourself?
A. Oh, yeah.
Q. And what vehicle were you driving?
A. I was driving my, my car. It was a `97 Cadillac.
Q. Okay. And then explainyou got on Lamington Road and then explain what occurred.
A. Well I'm driving down the road, and as I was passing the farm or to the farmland area up there, there was a bend. And prior to turning on the bend what appeared to me to be headlights right smack inalmost in front of me to theactually to the left of me a little bit, but I could see that that person was not totally on the other side of the lane.
Q. You were driving north or south?
A. I'm driving north.
Q. Okay. And this other vehicle you observed is on the south
A. Yeah, south, he's driving the opposite lane to pass me, you know, on the other side.
Q. Coming from opposite lane of travel.
A. Yes.
Q. Not passing in your own lane of travel.
A. No, no, I'm sorry.
Q. And then explain what happened explain the road and what took place.
A. Well to the best of my knowledge this thing happened so fast. Iit happened in a matter of seconds before I wasby the time you actually see me, by the time the accident occurred. What appeared to me was that the headlights werethis person was either definitely partially or maybe more into my lane of whatthis is the way it looked. I didn't know what to do. I jumped the car over to the side, to the left hand side. And I never hit the
Q. When you say left, that would be facing toward the southbound direction?
A. Yes.
Q. Okay.
A. I pullI punched it in real fast, and I didn't hit the car, so itbut actually I hit the tree, which I didn't see. You couldn't see five feet in front of you. You couldn't see the tree there anyway. And I knew there was a ditch on the other side. I knew that because I take that road all the time, every day. And I justit was like jumped the car right over. I must have whacked into the *646 tree and that's when thatthat's when the accident occurred.
Defendant now appeals raising the following arguments:
POINT I
THE STATE DID NOT MEET ITS BURDEN OF PROOF BEYOND A REASONABLE DOUBT THAT MR. CRYAN DROVE WHILE INTOXICATED AND HIS CONVICTION MUST BE REVERSED
POINT II
ANY POST-ARREST STATEMENTS MADE BY MR. CRYAN WERE UNCONSTITUTIONALLY OBTAINED AND SHOULD BE SUPPRESSED
We reject these arguments and affirm. We will address the defendant's second point first.

II
It is undisputed that despite being in police custody defendant was never advised of his rights under Miranda. Defendant therefore argues that the statements he made to Police Officers Cooper, Rock and Stephens should have been suppressed because they were the product of police interrogation or the functional equivalent thereof. We disagree.
In order to violate a defendant's constitutional rights against self-incrimination, a defendant's incriminating statements must be "the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 303, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297, 309 (1980). The concept of being subjected to the functional equivalent of a police interrogation was succinctly explained by Judge King in State v. Ward, 240 N.J.Super. 412, 418, 573 A.2d 505 (App.Div.1990):
It is clear therefore that the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. "Interrogation," as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.
We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. (emphasis added) [citation omitted.]
Thus, in Ward we suppressed statements made by a defendant in response to *647 being shown photographs of two suspects in a robbery without first advising him of his Miranda rights. The rationale for this decision was again clearly explained by Judge King:
We believe [sic] the Detective's undertaking here was designed to elicit a response, both helpful to the investigation and incriminatory of his suspect. His attempt succeeded, in part. Defendant should have been given the Miranda warnings before, not after, the Detective started the process so clearly designed to entangle the defendant in the criminal event.

[Ibid.]
We reached a similar conclusion in State v. Brown, 282 N.J.Super. 538, 660 A.2d 1221 (App.Div.), certif. denied, 143 N.J. 322, 670 A.2d 1064 (1995). In Brown, we suppressed statements made by a defendant without Miranda warnings which were in response to a detailed, comprehensive presentation by the police of the evidence against him. In excluding defendant's inculpatory statements we held that:
A detailed, forty-five minute to one hour explanation of all of the evidence was certainly more than was required by defendant's question. Moreover, it is apparent that Gold was already prepared to give such an explanation, no matter what defendant said. Gold's response was long, detailed and apparently well-prepared. His analytical and accusatory iteration was clearly designed to invoke some response from defendant. Gold knew or should have known that defendant was likely to respond in some manner to the evidence presented. As such, we conclude that Gold's tactics were more egregious than the police action described in Ward. The itemization of the evidence should have been preceded by Miranda warnings.

[Id. at 550, 660 A.2d 1221]
By contrast, defendant's statements here were not the product of police action or part of a premeditated investigatory tactic designed to elicit an incriminating response. Here, defendant himself initiated each and every encounter with the police in an effort to improperly obtain favorable treatment from the officers connected with his arrest. The incriminating statements defendant made in the course of these encounters were the product of his own conduct. In fact, the most damaging statements made by defendant came about through his repeated attempts to improperly influence the conduct of the police by wrongfully questioning Officer Cooper's actions and motives, displaying PBA cards and pleading for special treatment based on his perception of DWI as a de minimis offense.
In State v. Mallozzi, 246 N.J.Super. 509, 516, 588 A.2d 389 (App.Div.), certif. denied, 126 N.J. 331, 598 A.2d 889 (1991), we held that unexpected incriminating statements made by an in-custody defendant in response to non-investigative questions by the police without prior Miranda warnings are admissible. The conduct of the police here is even more benign. Here, it was defendant who repeatedly and aggressively sought out and engaged the police in conversation in an effort to improperly influence their law enforcement decisions. If in the course of such unsolicited conversations a defendant makes self-incriminating statements to the police, he has only himself to blame. Under these circumstances, the police were not obligated to advise defendant of his rights under Miranda before responding to defendant's unsolicited statements. See State v. Chew, 150 N.J. 30, 66, 695 A.2d 1301 (1997), cert. denied, sub nom., Chew v. New Jersey, 528 U.S. 1052, 120 S.Ct. 593, 145 L.Ed.2d 493 (1999).
*648 We thus hold that unsolicited statements made by defendant while in police custody and without the benefit of Miranda warnings were properly admitted into evidence because they were not the product of police interrogation or its functional equivalent.

III
Defendant next argues that the State failed to prove his intoxication beyond a reasonable doubt. We again disagree. We will begin our analysis by stating the applicable standard of appellate review. In order to set aside the factual findings made by the trial court, we must be:
[T]horoughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction, ... then, and only then, [the appellate court] should appraise the record as if it were deciding the matter at inception and make its own findings and conclusions. While this feeling of "wrongness" is difficult to define, because it involves the reaction of trained judges in the light of their judicial and human experience, it can well be said that that which must exist in the reviewing mind is a definite conviction that the judge went so wide of the mark, a mistake must have been made. This sense of "wrongness" can arise in numerous waysfrom manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, a clearly unjust result, and many others.
[State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999)]
Here, the Law Division judge thoroughly reviewed the record of the Municipal Court trial and independently determined that the State had met its burden of proof based on the observations of police officers Cooper, Rock and Stephens; the observations of the paramedic who responded to the scene of the accident; and the statements of the defendant himself. Judge Edward M. Coleman articulated his findings and conclusions therefrom as follows:
Clearly, the Defendant had consumed some alcohol and he feared that his drinking had contributed to the accident. Defendant made numerous statements suggesting consciousness of guilt. Significantly, he did not say to the police at the scene that he was ill because of his diabetes, or explained to them that his blood sugar may be elevated. Defendant's various statements suggest knowledge that he had been caught drinking and driving rather than a perception that he was ill because of his diabetes.
In addition, the Defendant's subsequent strong-arm refusal to submit to blood testing supports the conclusion that Defendant was intoxicated and wanted to avoid detection.
I have considered the testimony of Dr. Ryan who tried very hard to avoid harming the Defendant, but she made some important concessions. Dr. Ryan admitted that drinking alcohol can contribute to a rise in blood sugar in a diabetic. She also admitted that while certain symptoms were almost always present in patients whose blood sugar had reached very high levels, the Defendant did not complain about those symptoms at the scene of the accident.
This Court recognizes the fact that the Defendant was injured as a result of the accident, and that those injuries may have contributed to his condition immediately after the accident. However, given Defendant's coherence, the Court finds it odd that he was not able to recite the alphabet properly, and that he had other troubles. He made no reference *649 to being ill because of his diabetic condition, at the scene of the accident. His defense at trial was based on this illness as opposed to intoxication. But the diabetic condition, although certainly present, was a contributing factor and not the only basis of the impairment.
We find Judge Coleman's findings to be well-supported by the credible evidence and thoroughly agree with his well-reasoned analysis.
N.J.S.A. 39:4-50(a) prohibits the operation of a motor vehicle under the influence of intoxicating liquor. The phrase "under the influence" means a substantial deterioration or diminution of the mental faculties or physical capabilities of a person. State v. Tamburro, 68 N.J. 414, 420, 346 A.2d 401 (1975). In a case involving intoxicating liquor, "under the influence" means a condition which so affects the judgment or control of a motor vehicle operator "as to make it improper for him to drive on the highway." State v. Johnson, 42 N.J. 146, 165, 199 A.2d 809 (1964).
In State v. Morris, 262 N.J.Super. 413, 421, 621 A.2d 74 (App.Div.1993), we found evidence of slurred speech, loud and abrasive behavior, disheveled appearance, red and bloodshot eyes and strong odor of alcoholic beverage on defendant's breath was sufficient to sustain a conviction for DWI. Most of these same elements are present here.
Officers Cooper and Rock both testified that defendant had bloodshot eyes and a strong odor of alcoholic beverage on his breath. The responding paramedic made similar observations. Defendant's demeanor was hostile against both police officers as well. He also failed to follow Officer Cooper's directions in attempting to perform the finger dexterity test and recitation of the alphabet test. He gave inconsistent accounts of the amount of alcohol he had consumed and deliberately and repeatedly attempted to frustrate the police investigation of the accident by his unfounded accusations against Officer Cooper.
Lieutenant Stephens also noted a strong odor of alcoholic beverage emanating from defendant's breath and from his vomit. At one point, he had to place his hand on defendant's back in order to stop him from falling. Defendant also made a number of incriminating statements to Stephens which clearly revealed defendant's own assessment of his level of intoxication and concomitant impairment.
There is also strong support in the record for the Law Division's finding that defendant's refusal to consent to the taking of his blood for BAC analysis was an intentional and calculated act designed to prevent law enforcement authorities from obtaining conclusive evidence of his intoxication. His proffered explanation for his refusal, his alleged fear of needles, is patently specious in light of the medical treatment he received without objection at the emergency room. In this context, defendant's refusal to consent to the blood test was properly considered by the trial court as evidence of a consciousness of guilt. That is, that defendant believed himself to be intoxicated and that an analysis of his blood would have confirmed this.
Furthermore, the fact that defendant presented medical expert testimony that offered an alternative explanation for his conduct immediately after the accident does not render the trial court's conclusions legally defective. A judge sitting as the trier of fact is free to reject any testimony, in whole or in part, that he or she does not find credible, including the testimony of an expert. Here, Judge Coleman found that the expert's testimony as to defendant's diabetes did not adequately explain or justify defendant's conduct at *650 the scene of the accident. On the night of the accident, defendant testified that he had a sixteen-ounce glass of beer sometime after 9:00 p.m. He also said that he did not administer his third insulin injection as he is required to do. However, even if his diabetic condition rendered him more susceptible to the inebriating effects of alcohol, it does not constitute a defense to DWI. State v. Corrado, 184 N.J.Super. 561, 567, 446 A.2d 1229 (App.Div.1982); State v. Glynn, 20 N.J.Super. 20, 24-25, 89 A.2d 50 (App.Div.1952).
Affirmed.
NOTES
[1] Judge Petrella did not participate in oral argument. However, the parties consented to his participation in the decision.
[2] This is a reference to the obligation to advise defendant of his Constitutional rights as prescribed by the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The parties stipulated to take Lieutenant Stephens's statements from his police report.
[4] Despite this comment by defense counsel, this entire exchange took place on the record and was included as part of the reviewable record in this appeal.
[5] The parties stipulated to take Officer Cooper's testimony directly from her police report.
[6] Dr. Ryan defined diabetic ketoacidosis as high blood sugar level which develops into a state of acidosis, where the serum or blood PH level is decreased. In this state the patient must be aggressively treated in a hospital setting with both insulin and IV fluids.