**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3985-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LANCE C. NIX,

    Defendant-Appellant.

_____

Submitted February 27, 2025 – Decided March 10, 2025

Before Judges Natali and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 22-09-0893.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Daniel S. Rockoff, Assistant Deputy Public Defender, of counsel and on the brief).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Megan A. Hughes, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following the Law Division's denial of his motion to suppress, defendant pled guilty to third-degree possession of a controlled dangerous substance (CDS), methamphetamine, contrary to N.J.S.A. 2C:35-10(a)(1), and was sentenced to a four-year non-custodial probationary term. Before us, defendant challenges the court's order denying his suppression application, his resulting Judgment of Conviction and sentence, and raises the following argument:

> THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BECAUSE THE STATE FAILED TO PROVE THAT OFFICERS HAD PROBABLE CAUSE TO ARREST THE DEFENDANT FOR DRIVING WHILE INTOXICATED.

After considering defendant's contentions, we reject them and affirm for the reasons expressed in Judge Joseph Paone's well-reasoned March 15, 2023 oral decision.

I.

We glean the relevant facts from Carteret Police Officer Javier Diaz's testimony at the March 15, 2023 suppression hearing and accompanying body worn camera (BWC) footage. At approximately 10:30 p.m. on March 27, 2022, the Carteret Police Department received a call concerning a four-door Honda

driving the wrong way on a one-way street.[1]  Officer Diaz responded and although he did not locate the previously described Honda, he did observe a Toyota parked in a no parking zone.[2]

Officer Diaz observed an individual, later identified as defendant, "slumped over the driver seat" of the Toyota.  Defendant was alone in the car with the keys in the ignition, but the engine was not running.  Officer Diaz unsuccessfully attempted to wake defendant by knocking on his window before reaching in an open window.  Defendant awakened after Officer Diaz touched him.

Once defendant was awake, Officer Diaz inquired as to why he was illegally parked and slumped over the steering wheel.  The officer asked for his license, registration, and insurance, and defendant initially provided only his identification.  Officer Diaz stated although he did not smell alcohol, he noted defendant's "speech was slurred," he appeared "lost," and based on his training and experience, appeared to be "under the influence of some type of drug."  The

---

[1]  On the BWC footage, another officer, identified by Officer Diaz as Sergeant Rosario, whose first name does not appear in the record, stated the call to the police station informed, "there was a car like [defendant's car] driving on the wrong side of the road and the driver was slumped over the wheel."

[2]  Officer Diaz incorrectly informed defendant at the scene he was parked on the wrong side of the road.  He was, however, as noted, parked in a no parking zone.

officer also testified that he did not smell marijuana or see any drugs or related contraband in the car.

Officer Diaz testified defendant provided contradictory statements. He first stated he was not driving before admitting to driving and parking in the no parking zone because he was "visiting somebody . . . ." He then began honking his horn to alert individuals in an adjacent building to come out, despite Officer Diaz's instructions for him to stop. During this interaction, defendant repeatedly told Officer Diaz he did not wish to speak with him and used expletives including calling the officer a "f[***]ing liar" and told him to "get the f[**]k out of here . . . ."

Based on defendant's slurred speech, combative behavior, and inability to follow directions, Officer Diaz requested defendant exit the car. He then conducted a pat-down search which revealed a large wrench in defendant's pocket. Officer Diaz requested defendant perform three standard field sobriety tests, during which defendant was "argumentative" and again "tried to talk to the person in the building[]."

Officer Diaz first conducted the Horizontal Gaze Nystagmus test which did not reveal signs of defendant's intoxication. Defendant next participated in the walk-and-turn test during which he repeatedly interrupted Officer Diaz's

4

instructions. Defendant incorrectly turned to the right despite being instructed to turn to the left which Officer Diaz interpreted as a sign of possible intoxication but determined that "clue" was insufficient to conclude defendant was intoxicated in light of defendant's other positive responses.

Officer Diaz next requested defendant perform the one-leg stand test which he unsuccessfully completed. During the test, defendant was unable to hold his foot up, swayed, and used his arms for balance, all of which was confirmed by the BWC footage. Defendant continued to be argumentative, curse, blame the wind and temperature for his inability to successfully complete certain tasks, and again attempted to talk to residents in an adjacent building. The BWC footage revealed defendant stumbling sideways after initially lifting his foot off the ground.

Based on his observations and interactions with defendant, Officer Diaz arrested defendant for driving while intoxicated (DWI) and transported him to the police station. The police then searched defendant and discovered a glove in his jacket pocket containing heroin, pills, approximately 187 wax folds containing narcotics, empty bags, and hypodermic needles. Defendant became belligerent when Officer Diaz requested he remove his sweatshirt, repeatedly

A-3985-22

yelling "stop touching me" and calling on other officers to "tell this p[****] to stop touching me."

While another officer was fingerprinting defendant and inventorying the drugs seized from his pockets, defendant grabbed the drugs and attempted to swallow them. The police attempted to remove the CDS from defendant's mouth but because they believed he may have ingested them, the police decided not to test defendant's blood as they were concerned defendant's actions would impact the reliability of any results. Defendant submitted to a breathalyzer test at the station which yielded blood alcohol content of 0.0.

After considering the parties' arguments, Officer Diaz's testimony, and the BWC footage, Judge Paone denied defendant's motion to suppress and supported his decision in an oral opinion. The judge found Officer Diaz credible because he "testified professionally" without "demonstrating any particular emotion or bias," his testimony was "accurate . . . [and] corroborated by the video tape," he did not embellish, "conceded when the defendant . . . performed the [field sobriety] test properly," and was consistent and believable. Judge Paone further found the officers initially conducted a permissible field inquiry as the initial line of questioning did not "rise to the level of an investigatory stop," and only when the officers discovered defendant's condition and he exhibited behavior

6

consistent with intoxication, did the "field inquiry . . . transform[] into an investigatory stop . . . ."

Further, Judge Paone found Officer Diaz's credible testimony regarding: (1) defendant's condition slumped over the steering wheel; (2) slurred responses about driving; (3) the presence of the key in the ignition; and (4) the location of the car in the no parking zone, supported the conclusion the "police officer had sufficient reasonable and articulable suspicion to temporarily detain defendant and to perform field sobriety tests." Finally, the judge determined in light of defendant's "untoward antagonistic [and] confrontational" demeanor, his failed field sobriety test, along with Officer Diaz's initial observations, the police had probable cause to believe he "was operating a vehicle while under the influence," and was therefore "lawfully arrested," and the officers were "justified in searching him, because . . . [the] search [was] incident to his arrest."

On appeal, defendant challenges Judge Paone's legal conclusion that Officer Diaz had probable cause to arrest him and reprises his contention the CDS seized should have been suppressed as they represented the fruits of an unlawful search incident to arrest. He first asserts Officer Diaz lacked "direct sensory evidence of drug use" and highlights that Officer Diaz, did not "spot[] any drugs or alcohol in plain view [or] . . . smell any drugs or alcohol."

Second, defendant contends the "circumstantial evidence of intoxication was severely lacking . . . [as] there was no motor vehicle accident, no [observation of the defendant] weaving or mishandling . . . the vehicle, and no admission to drinking or drug use that day." Defendant further maintains Officer Diaz was not responding to a 911 call about him, did not see defendant driving, did not "observe any apparent physical symptoms of recent drug use despite the fact that he had the opportunity to examine [defendant's] face at very close range," and he did not have any difficulty getting out of the car.

Third, defendant claims Judge Paone improperly considered his use of vulgar language as courts have repeatedly protected the use of profane language, nor was his sleepiness or difficulty finding documents probative of intoxication since he had just woken up. Defendant further avers his disinterest in speaking with Officer Diaz was not unlawful.

Finally, defendant argues the results of the three sobriety tests Officer Diaz administered did not support a finding of probable cause. Most notably, defendant contends the "one-legged stand test failed to account for the unideal conditions in which the test was administered," including wind and cold, which could have led to a false positive, and he cites scientific authority indicating sober individuals frequently exhibited the "clues" indicative of intoxication.

A-3985-22

Defendant argues the wind and temperature which are evident in the BWC audio recording affected his performance and he informed Officer Diaz of the "unideal testing conditions." We reject all of these arguments and, as noted, affirm substantially for the reasons expressed by Judge Paone in his oral decision. We provide the following comments to amplify our decision.

## II.

"Our standard of review on a motion to suppress is deferential . . . ." State v. Nyema, 249 N.J. 509, 526 (2022). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Ahmad, 246 N.J. 592, 609 (2021) (alteration in original) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). We "defer[] to those findings in recognition of the trial court's 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Nyema, 249 N.J. at 526 (quoting Elders, 192 N.J. at 244); see also State v. Smart, 253 N.J. 156, 164 (2023). Accordingly, "[w]e will set aside a trial court's findings of fact only when such findings 'are clearly mistaken.'" State v. Dunbar, 229 N.J. 521, 538 (2017) (quoting State v. Hubbard, 222 N.J. 249, 262

(2015)). "We accord no deference, however, to a trial court's interpretation of law, which we review de novo." Ibid.

"The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, in almost identical language, protect against unreasonable searches and seizures." Smart, 253 N.J. at 164 (quoting Nyema, 249 N.J. at 527). Warrantless "searches and seizures conducted without warrants issued upon probable cause are presumptively unreasonable and therefore invalid." State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting Elders, 192 N.J. at 246). To overcome the presumption of an unreasonable search and seizure, the State must demonstrate by a "preponderance of the evidence that an exception to the warrant requirement applies." State v. Manning, 240 N.J. 308, 329 (2020).

Our Supreme Court has defined a field inquiry as "the least intrusive" form of police encounter, occurring when "a police officer approaches an individual and asks 'if [the person] is willing to answer some questions.'" State v. Pineiro, 181 N.J. 13, 20 (2004) (alteration in original) (quoting State v. Nishina, 175 N.J. 502, 510 (2003)). "A field inquiry is permissible so long as the questions '[are] not harassing, overbearing, or accusatory in nature.'" Ibid. (alteration in original) (quoting Nishina, 175 N.J. at 510). During such an inquiry, "the

individual approached 'need not answer any question put to him [or her]; indeed, he [or she] may decline to listen to the questions at all and may go on his [or her] way.'" State v. Privott, 203 N.J. 16, 24 (2010) (quoting State v. Maryland, 167 N.J. 471, 483 (2001)).

Unlike a field inquiry, an investigatory stop, also known as a Terry[3] stop, is characterized by a detention in which the person approached by a police officer would not reasonably feel free to leave, even though the encounter falls short of a formal arrest. See State v. Stovall, 170 N.J. 346, 355-57 (2002); see also Terry, 392 U.S. at 19. "Because an investigative detention is a temporary seizure that restricts a person's movement, it must be based on an officer's 'reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in, criminal activity.'" State v. Rosario, 229 N.J. 263, 272 (2017) (omission in original) (quoting Stovall, 170 N.J. at 356). "The 'articulable reasons' or 'particularized suspicion' of criminal activity must be based upon the law enforcement officer's assessment of the totality of circumstances . . . ." State v. Davis, 104 N.J. 490, 504 (1986). "There must be 'some objective manifestation that the person [detained] is, or is about to be engaged in criminal activity.'" Pineiro, 181 N.J. at 22 (alteration in original)

_____

[3] Terry v. Ohio, 392 U.S. 1 (1968).

(quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). The "[r]easonable suspicion necessary to justify an investigatory stop is a lower standard than the probable cause necessary to sustain an arrest." Stovall, 170 N.J. at 356.

This test is "highly fact sensitive and, therefore, not readily, or even usefully, reduced to a neat set of legal rules." State v. Golotta, 178 N.J. 205, 213 (2003) (quoting Nishina, 175 N.J. at 511). "For analytical purposes . . . , a stop founded on a suspected motor vehicle violation essentially is governed by the same case law used to evaluate a stop based on suspected criminal or quasi-criminal activity." Ibid. Importantly, "the State is not required to prove that the suspected motor-vehicle violation occurred." State v. Locurto, 157 N.J. 463, 470 (1999).

In the context of a motor vehicle stop, a police officer is permitted to approach a parked car and engage the driver in voluntary conversation. State v. Stampone, 341 N.J. Super. 247, 252 (App. Div. 2001). This constitutes a field inquiry. Ibid. "[A] field [inquiry] is not a Fourth Amendment event 'so long as the officer does not deny the individual the right to move.'" State v. Egan, 325 N.J. Super. 402, 409 (Law Div. 1999) (quoting State v. Sheffield, 62 N.J. 441, 447 (1973)). The transition from field inquiry to investigatory stop occurs when

the interaction objectively conveys to the driver that the engagement was not voluntary, and he or she was not free to leave. Stampone, 341 N.J. Super. at 252. However, there is no seizure if: "(1) the officer's questions were conversational in manner, (2) the officer made no demands or issued orders; and (3) if the officer's questions were neither 'overbearing or harassing in nature.'" Egan, 325 N.J. Super. at 409 (quoting State ex rel. J.G., 320 N.J. Super. 21, 30 (App. Div. 1999)).

"To justify a warrantless search or seizure, 'the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023) (alteration in original) (quoting State v. Chisum, 236 N.J. 530, 546 (2019)). Each exception to the warrant requirement has their own essential elements that must be satisfied to justify a warrantless search. State v. Johnson, 476 N.J. Super. 1, 20 (App. Div. 2023).

One such exception to the warrant requirement is the search incident to arrest, an exception "limned for two specific purposes—the protection of the police and the preservation of evidence . . . ." State v. Eckel, 185 N.J. 523, 524 (2006). Under this exception to the warrant requirement, "an officer [has] the

right to search a defendant's person without a warrant if there is probable cause to arrest." State v. Roman-Rosado, 462 N.J. Super. 183, 201 (App. Div. 2020).

Here, the court correctly concluded Officer Diaz's initial approach of the vehicle was a field inquiry. Given Officer Diaz's observations of defendant illegally parked and "slumped" over the steering wheel, the field inquiry evolved to then permit him to inquire as to why defendant parked on the incorrect side of the street, engage defendant in consensual conversation about the situation, and check on his wellbeing. Egan, 325 N.J. Super. at 410.

We are further satisfied Officer Diaz's observations of the defendant, considering his training, experience, and rational inferences drawn therefrom, gave the Officer a factual basis for a reasonable and articulable suspicion that defendant was under the influence and may have driven while intoxicated. See United States v. Sokolow, 490 U.S. 1, 8 (1989). Officer Diaz unsuccessfully knocked on the window several times to wake defendant and subsequently reached inside the vehicle and touched defendant, which woke him up. While Officer Diaz did not see any drug paraphernalia, alcohol, nor did he smell anything that would indicate the use of drugs or alcohol, he testified, consistent with the BWC footage, that defendant appeared "lost," slurred his speech, and

had difficulty following the instructions to retrieve his license, registration, and insurance, which he struggled to locate.

Also, during this initial conversation, defendant repeatedly honked the horn despite clear instructions not to, argued about where he was parked, and yelled at the officer telling him to "get the f[**]k out of here man" along with other profane epithets. "[L]oud and abrasive behavior," such as was exhibited here, can validly be used to observationally prove impairment. State v. Zingis, 471 N.J. Super. 590, 602 (App. Div. 2022) (quoting State v. Cryan, 363 N.J. Super. 442, 455-56 (App. Div. 2003)). Accordingly, Officer Diaz properly requested defendant to exit the vehicle and perform field sobriety tests based on a reasonable and articulable suspicion of DWI.

We are also convinced the evidence adduced at the suppression hearing was sufficient to establish defendant intended to operate his vehicle while under the influence. As we recently explained in State v. Thompson:

> [N.J.S.A. 39:4-50(a)] prohibits "operat[ion]" of a vehicle while under the influence. "Operation" has been interpreted broadly, State v. Tischio, 107 N.J. 504, 513-14 (1987); State v. Mulcahy, 107 N.J. 467, 478 (1987); State v. Wright, 107 N.J. 488, 494-503 (1987); State v. Sweeney, 40 N.J. 359, 360-61 (1963), and encompasses more than just "driving" a vehicle. Operation, for example, includes sitting or sleeping in a vehicle, with the engine running, even when the vehicle isn't in motion. Indeed, [t]he Supreme Court

15

has recognized that "operation" may be found from evidence that would reveal "a defendant's intent to operate a motor vehicle." Tischio, 107 N.J. at 513. Thus[,] an intoxicated person could be found guilty of violating N.J.S.A. 39:4-50(a), when running the engine without moving the vehicle, as here, or by moving or attempting to move the vehicle without running its engine, see State v. Stiene, 203 N.J. Super. 275, 279 (App. Div. 1985). The Supreme Court has held that an individual who staggers out of a tavern but is arrested before he is able to insert a key into his vehicle's ignition may be convicted of N.J.S.A. 39:4-50(a). Mulcahy, 107 N.J. at 470, 483. In short, operation not only includes the circumstances to which we have just referred but may also be established "by observation of the defendant in or out of the vehicle under circumstances indicating that the defendant had been driving while intoxicated." [State v. Ebert, 377 N.J. Super. 1, 11 (App. Div. 2005)].

[462 N.J. Super. 370, 374-75 (App. Div. 2020) (footnotes omitted), certif. denied, 246 N.J. 214 (2021).]

Here, defendant admitted to driving to the no parking zone, waiting for an unclear amount of time, and falling asleep at the wheel. He also indicated he planned on driving home and another officer noted the keys were in the ignition. Thus, based on the above-cited legal principles, defendant exhibited an intent to operate the vehicle. See State v. Chapman, 43 N.J. 300, 301 (1964) (affirming defendant's conviction for DWI where he "was found intoxicated at the wheel

16

of the vehicle, standing with [the] motor off at a position other than a normal one for parking").

Finally, because the police had probable cause to arrest defendant, Judge Paone properly denied his application to suppress the CDS because they were seized at the police station incident to defendant's arrest. Roman-Rosado, 462 N.J. Super. at 201. To the extent we have not specifically addressed any of defendant's remaining arguments, it is because we have concluded they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

17

A-3985-22