# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1624-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOHN G. FORMISANO,

     Defendant-Appellant.

_____

Argued February 27, 2025 – Decided March 28, 2025

Before Judges Natali, Walcott-Henderson, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 19-12-1011.

Marcia H. Blum, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Marcia H. Blum, of counsel and on the briefs).

Thomas M. Caroccia, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Thomas M. Caroccia and Steven A. Yomtov, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant John G. Formisano appeals from his convictions for the first-degree murder of his estranged wife, Christie Formisano,[1] the attempted murder of Timothy Simonson, whom Christie was dating, as well as possession of a weapon for an unlawful purpose, official misconduct, endangering the welfare of a child, and hindering apprehension or prosecution.  The judge imposed an aggregate seventy-nine-year custodial term of imprisonment, with fifty-five and one-quarter years of parole ineligibility.  Before us, defendant challenges only his convictions and raises the following points for our consideration:

> POINT I
>
> THE MURDER CONVICTION MUST BE REVERSED BECAUSE THE COURT FAILED TO PROVIDE THE JURY WITH MEANINGFUL GUIDANCE WHEN IT ASKED FOR "A CLEAR DEFINITION" OF THE LESSER-INCLUDED OFFENSE OF PASSION/PROVOCATION MANSLAUGHTER.
>
> POINT II
>
> THE OFFICIAL MISCONDUCT CHARGE SHOULD HAVE BEEN DISMISSED BECAUSE THE STATE FAILED TO PRESENT PRIMA FACIE EVIDENCE ON THE ESSENTIAL ELEMENT THAT

---

[1]  At times the record refers to Christie by her maiden name.  To avoid confusion, we refer to Christie by her first name throughout this opinion, intending no disrespect.

DEFENDANT COMMITTED AN ACT RELATING TO HIS ROLE AS A POLICE OFFICER.

POINT III

ALL OF [DEFENDANT'S] STATEMENTS SHOULD HAVE BEEN SUPPRESSED: THE SEMINAL INCULPATORY ADMISSIONS WERE OBTAINED THROUGH UNWARNED QUESTIONING AND DID NOT PERTAIN TO PUBLIC SAFETY; THE SUBSEQUENT ADMISSIONS WERE THE RESULT OF THE QUESTION-FIRST, WARN-LATER INTERROGATION PROCEDURE.

A. The incriminating statements obtained in response to both of the unwarned questions should have been suppressed.

B. The incriminating statements obtained following the first set of warnings should have been suppressed because the warnings were deficient[,] and the statements were elicited by the police.

C. The incriminating statements obtained after the deficient warnings and the belated second set of warnings should have been suppressed because [defendant] was not told that his earlier damaging statements could not be used against him.

POINT IV

THE CONVICTIONS MUST BE REVERSED BECAUSE THE MATTER WAS INVESTIGATED AND PROSECUTED BY THE MORRIS COUNTY PROSECUTOR IN VIOLATION OF N.J.S.A. 52:17B-107(a)(2) AND ATTORNEY GENERAL LAW ENFORCEMENT DIRECTIVE NO. 2019-4, WHICH REQUIRE THAT THE ATTORNEY GENERAL

3

INDEPENDENTLY INVESTIGATE AND PROSECUTE MATTERS INVOLVING SHOOTINGS BY POLICE OFFICERS.

Having considered these arguments in light of the record and applicable legal standards, we affirm.

## I.

Defendant was a Newark police officer for twenty-four years. He lived at 1 Mirror Place in Oak Ridge with Christie and their two children, a son and daughter. At the time of trial, Steven Sole, defendant's neighbor who lived at 3 Mirror Place, indicated he had met defendant approximately thirteen or fourteen years ago and had a "friendship" with him. Sole indicated by July 2019, defendant was not living at 1 Mirror Place and was instead living with his mother in Livingston because defendant and Christie "were having some issues and he thought it was best if he just moved out."

Around June or July 2019, Simonson testified he met Christie through an online dating site. Simonson began messaging Christie on the dating site and they eventually exchanged text messages. He and Christie met in person approximately two weeks after they first started communicating. When he met Christie, she informed him she was divorced.

Simonson eventually met Christie's children and indicated he had been to Christie's house a few times to "hang out." Simonson testified Christie's relationship with defendant did not have any impact on his ability to see Christie, and he had never met defendant before the incident.

On Sunday, July 14, 2019, Simonson "went over to visit" Christie around 9:00 p.m. He drove his grandmother's car, a white Ford Fusion, to her house. At Christie's instruction, he did not park in the driveway or in front of the house because of her "nosey neighbors" and arrived around 9:30 p.m. While the children were asleep and Simonson and Christie were playing a board game, Christie took a phone call in the kitchen which lasted approximately two or three minutes. Later in the evening Simonson and Christie went to the bedroom and "had sex."

Later that night, Christie said she "saw something out the window" that "looked like a flashlight." Christie looked out the bedroom window and "said he's here, it's him." Simonson "put [his] shirt on" and Christie "put on a robe and went out the [bedroom] door." Christie closed the bedroom door behind her.

Seconds after Christie left the bedroom, Simonson heard her yell in a scared tone, "[h]e's got a gun, call 911." Simonson "[k]ind of froze for a

5

second," and then he heard three gunshots from "just outside the [bed]room." He stated after hearing the gunshots, he "tried to get out the window, because [he] knew [he] would be next," but he was not able to open it. Simonson said he was standing near the bedroom window behind the bed, and later in front of the closet "to the right of the front window," when an individual "[s]houldered the door and came in." Simonson testified the individual was "wearing a police uniform" with a "[d]ark top with gold trimmings." Acting Newark Police Lieutenant Ricardo Vitorino, defendant's then-co-worker, testified defendant would typically wear a baseball jersey to cover his police uniform at the end of a shift but did not wear a jersey over his uniform when he left the precinct on the night of the incident.

Simonson saw something "start[] flashing" in the individual's hand and he realized he "was getting shot at." He indicated he was shot several times and "[i]t was like a hot fire poker going into you." Simonson said the individual shooting at him was angry and yelling but he could not remember what was said. Simonson testified after the person left the room, he "just put [his] head down, kind of knew [he] was shot a bunch, figured it was the end, and made [his] peace." He "laid there for quite awhile and realized that [he] hadn't died, so [he] took [his] cell phone out to try and call 911," but his phone "had taken a shot"

6

and did not work. Severely injured, Simonson was able to make his way to the kitchen where he located Christie's phone and called 911 to report the shooting.

Meanwhile, Christie had fled the house and sought help. Sole was at home with his wife and mother watching TV when he heard his Ring doorbell and was alerted through the app on his phone. As Sole approached the front door to answer, he "heard a few loud bangs" which sounded like they were coming from "directly in front of [his] house."

Around the same time, another neighbor, Nancy Spetz, was at home with her husband, Charlie, and three of her children. Nancy testified her son, Steven Spetz, was watching TV downstairs when she went upstairs to her bedroom. She told Steven to lock the front door after his two siblings returned home for the night. As she was getting ready for bed, Nancy "heard a noise" and "thought there was a bear outside." Nancy identified defendant at trial and although she was not very close to him, she knew he was a Newark police officer.

Once she heard the noise, Nancy looked out her bedroom window and "saw [defendant] . . . walking fast into [her] driveway," "coming from his house . . . walking toward [her] front door" wearing a dark "police uniform . . . ." Steven was watching TV when he "heard a thud into the door" and then "heard two or three 'helps,'" which he identified as a woman's voice. Steven

started walking towards the front door when he "heard gunshots and . . . dropped on all fours." Steven thought he heard "[t]hree or four" gunshots.

Nancy stated once defendant was by her front door, she saw "him raise his hand, and [she] saw a gun in his hand, and he shot it." Nancy was unable to see the front steps of her house from her bedroom window. Nancy said she "lift[ed] up [her] window" and said, "John, I see you." According to Nancy, defendant "looked up at [her,] and he brought his eyes back down to what he was looking at the front door and he shot . . . two or three more times." Nancy then went into her bathroom and dialed 911. The recording of the 911 call was played for the jury and entered into evidence at trial:

> OPERATOR: 911. What's your emergency?
>
> [Nancy]: Hi. I live at 5 Mirror Place right in the White Rock section and a man just shot his wife in front of my house.
>
> OPERATOR: He just what?
>
> [Nancy]: You gotta hurry up because she's dying in front of my house, please.
>
> OPERATOR: Okay, ma'am. It's 5-what? What town are you in, ma'am?
>
> [Nancy]: 5 Mirror Place, right off of . . . White Rock Boulevard, please.
>
> OPERATOR: Okay. 5 Mirror Place.

8

[Nancy]: He's a Newark cop. He's a Newark cop, and he lives on the corner. He shot her, I saw him. I saw him through my window.

OPERATOR: Okay, ma'am. Ma'am, hold on, take a deep breath for me, okay? I'm gonna—

[Nancy]: He had his uniform on—

OPERATOR: Okay. Give me one second, all right?

[Nancy]: She's dying in front of my house.

OPERATOR: I'm—I'm—I have to contact Jefferson, ma'am, okay?

[Nancy]: Yes, yes, hurry up, please.

After hearing the gunshots, Steven opened the door and "saw [a woman] laying down with bullet wounds in her chest." He testified he did not know who the woman was at the time. Steven stated, "because she had a white shirt on," he could see blood coming from her chest. He recalled the woman "tried to say something, [he] assumed it was help, and then blood started pouring out of her mouth."

When Sole opened his front door and stepped out onto his front steps, it triggered the motion light on the right of the door, and he was able to see defendant "[fifteen] or [twenty] feet in front of [him] on [his] front lawn." Defendant was wearing "[h]is police uniform," and Sole saw him "running

9

across [his] lawn" from the direction of 5 Mirror Place back toward the direction of his house at 1 Mirror Place. Sole said to defendant, "what's up, John, or what's up, Johnny." Defendant replied, "[j]ust doing busy work" and told Sole to "[g]o get the kids."

Detective Supervisor Steven Gangi of the Morris County Prosecutor's Office reviewed the Ring doorbell footage from Sole's house. The following footage was played for the jury at trial:

> [FIRST] FEMALE VOICE: Help me. I've been shot.
>
> [FIRST] MALE VOICE: What's up?
>
> [SECOND] MALE VOICE: Just taking care of some busy work. Can you go get the kids?
>
> [FIRST] MALE VOICE: What kids? Get inside. Get inside.

After that exchange, Sole looked over to the area of 5 Mirror Place and "saw Christ[ie] laying on the front steps." Sole knew it was Christie "[i]mmediately" because of her "red hair." He ran over to her and "saw blood pooling." Sole observed Charlie at his front door and he "reached over to [Christie] and . . . checked her pulse" and confirmed she had no heartbeat. Sole then ran back to his house, pushed his wife inside, and "said I think John just shot Christ[ie]."

Joseph Diliberto, Jr., who lived across the street from 1 Mirror Place, testified he was sleeping when he heard gunshots "from across the street" through his open bedroom windows. Diliberto also identified defendant at trial as his neighbor. At first, Diliberto heard "two or three shots, and then probably maybe five minutes later there was another one or two." Diliberto also heard "somebody banging on a door asking for help because they were shot." He could tell the voice "was a woman['s]." Diliberto "tried looking through the side window to see what was going on because there w[ere] other people outside, and [he] could see on the one neighbor's porch there was something laying on it." He then saw "somebody walking across the yards and get in a white car and drive away." The person was wearing a "[d]ark jacket and pants," and the white car was located on White Rock Boulevard. Diliberto, who is an auto mechanic, recognized the car as "a white Mazda, similar to what John drove."

Gangi also reviewed security footage obtained from Sole's house. The footage contained video, which was played for the jury, but no audio. He testified the footage "basically capture[d] a white sedan at approximately 11:10 p.m. coming from White Rock Boulevard, passing 1 Mirror, 3 Mirror" and then "coming back . . . towards White Rock Boulevard." He then indicated the footage showed "an individual come from the front of 1 Mirror and stand just

11

beneath the . . . master bedroom window" and "stand there for a couple of minutes" until "at approximately 11:16:44 and 11:16:48 [p.m.] you'll see a flash of light. And then just after that, soon after that, you'll see the individual leave this area and then walk back towards the front of 1 Mirror Place."

Gangi testified the footage also showed that around 11:15 p.m., "a female individual . . . run up to the . . . front porch of 3 Mirror." The footage then showed "an individual come from right to left along the top of your screen running across the driveway, and then across basically the front lawn of 3 Mirror, towards the direction of 5 Mirror Place," and "shortly after . . . you're going to see an individual coming back from that area, back from 5, across 3, towards number 1 Mirror Place." Around 11:20 p.m., Detective Gangi indicated the footage showed a female individual ring the doorbell at 3 Mirror Place "and at that time you're going to observe some severe lacerations to this person's right hand" and "[t]hey're also going to be holding their left side with their left arm." The footage also showed that same female "look[] around frantically, and then they're going to exit left towards 5 Mirror Place."

Simonson indicated he was on the phone with 911 for forty-eight minutes until law enforcement arrived. At some point while waiting for them, defendant's daughter came out of her bedroom and stood in the doorway and

"asked where mommy was," before Simonson "convinced her to go back into her room, because [he] didn't know what was going on and she didn't need to see any of this."

Simonson was taken to Morristown Hospital, where he stayed for seven days and underwent surgeries to repair his leg. Simonson sustained bullet wounds in his stomach, left bicep and triceps, right triceps, two in his left thigh, and he also sustained injuries to his lip and left hand. One of the bullets in his left thigh hit his femur and shattered it, requiring a titanium rod.

Livingston Police Department Patrolman Brian Kelly was called in for "an alleged homicide suspect traveling in our jurisdiction" based on "a ping on [defendant's] phone." He testified he and the six other officers dispatched were told to look out for "[a] white Mazda 6" and were advised the suspect was a Newark police officer. Kelly stated the officers were gathered at Heritage Middle School in Livingston when "the white Mazda 6 passed [his] vehicle on the right-hand side of Foxcroft Drive." He "conducted a felony stop" of the car and only saw one person in it. As he approached the car, Kelly was able to confirm the driver was the alleged suspect based on a Department of Motor Vehicles picture his sergeant had given him. He testified he subsequently

identified the suspect through the course of his investigation as defendant and identified defendant at trial.

Kelly and the other officers surrounded the car. When he reached the white Mazda, he saw defendant was wearing "navy blue" police uniform pants, "a baseball jersey, and a hat." The officers ordered defendant out of the car, "he complied, he had his hands up," and they "searched him and handcuffed him at that point" and put him in the "back of [Kelly's] patrol vehicle." Kelly indicated the Mobile Video Recording (MVR) on his patrol car activated when he turned his emergency lights on to make the stop, and once he put defendant into the back of his car, he "turn[ed] the camera towards" him. He said defendant "was complaining about his handcuffs being too tight." Kelly stated he was aware defendant was being arrested for "[a]n alleged homicide" and he "was advised that it was a handgun."

While he was adjusting defendant's handcuffs, defendant indicated the gun "was in the trunk" of his car. The MVR recording in Kelly's police car was entered into evidence and played for the jury at trial. In the recording, while Kelly was adjusting defendant's handcuffs, defendant told Kelly: "I'm sorry, man. I just—I just snapped. And all I've been doing is driving around in circles, waiting for you guys. . . . I didn't know if I should . . . kill myself." Kelly told

defendant, "[w]e're going to get you help." According to Kelly, defendant's demeanor was "pretty nonchalant" and he "complied with everything" the police asked.

Kelly brought defendant into Livingston police headquarters to be processed. Before doing so, Kelly testified he advised defendant of his Miranda[2] rights even though he had no plans to question him. Kelly explained defendant made several statements while in transport to the police station that were not made in response to any questioning by him. Those statements, detailed below, were also captured on the MVR recording:

> [DEFENDANT]: I was—I was going to shoot myself, but.
>
> OFFICER KELLY: Don't do it, man. We'll get you help.
>
> [DEFENDANT]: I couldn't explain, I couldn't even think, man. I got a—I got a three-year-old and an eight-year-old sleeping in the room right next to it, man.
>
> OFFICER KELLY: Yeah.
>
> [DEFENDANT]: Do you think I'm pitiful?
>
> OFFICER KELLY: What's that?
>
> [DEFENDANT]: Do you think I'm pitiful?

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

OFFICER KELLY:  I don't.  I just think you need help.

. . . .

[DEFENDANT]:  I've been a cop for [twenty-four] years, man.

OFFICER KELLY:  Yeah.

[DEFENDANT]:  Never—

OFFICER KELLY:  Your boys are looking for you, man.

[DEFENDANT]:  I never shot anyone before.  All those years.  I filed for divorce like two weeks ago . . .

. . . .

[DEFENDANT]:  I'd never hurt the kids.  I can't believe it, but it happened so fast.

OFFICER KELLY:  Yeah.

[DEFENDANT]:  Walked in, I had my uniform on, gun on, you know. . . . My daughter left her glasses in my car, you know.

OFFICER KELLY:  Yeah.

[DEFENDANT]:  So I went up there to just return the eyeglasses at my house.  And right on, you know, right on my bed, man, right, right in—right in my bedroom.

OFFICER KELLY:  Yeah.

[DEFENDANT]:  Thanks for listening, bro, I appreciate it.

16

Early in the morning on July 15, 2019, Detective Michael Bost with the Morris County Prosecutor's Office arrived at the Heritage Middle School area where defendant's car was located. Bost secured the car and searched it along with Detective Louis Goncalves of the Morris County Prosecutor's Office. Goncalves recalled the car was "a white Mazda 6, four door." In the trunk of the car, Goncalves found, among various other items and articles of clothing, "a Sig Sauer P229, a 9-millimeter" with a "round inside the chamber." Goncalves indicated the gun found in the trunk "was loaded."

Later that morning, Sergeant Michael Puskas of the Morris County Prosecutor's Office and Detective Eric Sudak of the Jefferson Township Police Department interviewed defendant at the Jefferson Township police station. At that point, Puskas had not "receive[d] a great deal of information, all [he] knew was that somebody had been placed in custody in Livingston" "and that he was being transported to Jefferson." Puskas testified he first met defendant in the interrogation room and gave him a blanket because he was cold.

Puskas also stated the entire interview with defendant was recorded and he advised defendant of his <u>Miranda</u> rights using "the form provided by the Morris County Prosecutor's Office." Puskas stated defendant initialed that he understood his rights and circled and initialed on the <u>Miranda</u> form that he

wished to speak to police. The first twenty-five minutes and fifty-five seconds of the recorded interview with defendant were played for the jury at trial and entered into evidence.

After Puskas read defendant his <u>Miranda</u> rights, defendant stated he "want[ed] to" talk to police "but it's not in my best interest." Puskas clarified "you tell me what you want to do, because you can, as I said to you, you can stop at any time" and told defendant, "I can't tell you what to do." Defendant then agreed to speak to police and signed the waiver form. Defendant indicated he and Christie had been together "eight and a half years," but they had "just began the process of divorce." He said they "couldn't make it work," and Christie had become "very mean to [him] for like no reason and, . . . cruel all the time." Defendant stated he would primarily stay at their house at 1 Mirror Place and he "would sleep on the couch," however, some of the time he would stay at his mother's house.

Defendant stated he was a sergeant with the Newark Police Department and that his normal shift was "[t]wo to ten." He explained he was at the house that night because Christie had called him to tell him their daughter had left her glasses in his car. Defendant said he got off work on July 14, 2019, at 10:00 p.m. and got to his house around 11:00 p.m. When he was outside the house, he

18

"called the house, but it rang, it rang two, three times, and [Christie] didn't answer." Defendant then said he entered the house using his key. He stated he went into the house with an off-duty holster which contained his duty weapon, "a Sig Sauer 9[-]millimeter P-229."

According to defendant, he got to the top of the stairs and saw Christie wearing a bathrobe. He said Christie was "like dressed, makeup and hair, but like if she was going out" and "she was basically like not wearing anything under the bathrobe practically." Christie was "asking [defendant] if [he] had a camera in the house" and he said no. Defendant said Christie stated, "I have someone here" or "[s]omething to that effect."

Defendant explained he "seriously blacked out" and he "looked down into [his] . . . bedroom, and the door was closed" "[s]o [he] knew somebody was in [his] bedroom and [he] just started to go over there." Christie "started fighting [defendant] to keep [him] from going . . . into the room" and defendant "heard somebody, you know, in there," which sounded like "a male's voice." At that point, defendant "just lost it." He said it was "so insane" and it "was just a combination, just like not being there, like surreal. And, and then when it was over, I just you know, I went back to my car and I drove off."

Defendant confirmed in the interview he parked his car on the street rather than in his driveway "[b]ecause [he] wasn't planning on staying." Once he left the scene, defendant "called up . . . [his] two . . . best friends to say [goodbye] to them, because [he] didn't plan on living." He "thought about killing [him]self" or thought he would "just drive to California." He said he "got rid of [his] phone" but did not "remember how" before he was stopped by Kelly and the other officers.

Defendant explained he "would never hurt [his] kids or anybody else," but he could not "understand why she would do that" or why Christie "would . . . sleep with somebody in [his] bed and with [his] kids home." He stated "[n]othing" was going through his mind when he was in the house and it "just was pure . . . rage." Defendant knew Christie "had started dating some guy for like four dates or whatever." According to defendant, he told Christie about "a week" before the incident "not to bring him by the kids or anything like that." He told police he had been prescribed anxiety medication previously, but he had not taken the medication for about a day and a half before the incident. He stated he had "never shot anybody on duty."

Around 7:00 a.m. on July 15, 2019, Bost searched defendant's bedroom at his mother's house. Bost found in the bedroom "a Newark Police Department

20

duffle bag" and "multiple plastic bins," one of which contained a handgun that was "later determined to be a Smith & Wesson model 457, .45 caliber." The gun was "fully loaded with seven rounds in it," but "there was no round in the chamber." Bost also located defendant's cell phone at 34 Baker Road, a private residence that was about "a mile and a half" from where defendant was stopped in his car and arrested. The owner of that home was in the process of moving and had "a large dumpster located at the end of the driveway." Bost found "an iPhone in a black case, and that was leaning up against an E-ZPass right underneath the dumpster." The E-ZPass had the same serial number that matched defendant's active E-ZPass account.

Gangi reviewed a forensic examination of the iPhone and determined the user of that phone was defendant. Gangi obtained records for defendant's phone from May 1, 2019, through July 15, 2019. He also reviewed records for Christie's cell phone for the same time-period. There were no records of any calls between defendant and Christie's phones on July 14, 2019. The last call between defendant and Christie's phones was on July 13, 2019, around 11:48 a.m. Gangi stated defendant had Christie's contact saved in his phone in a derogatory manner. Gangi determined defendant had changed Christie's contact name sometime after June 8, 2019.

21

Gangi also reviewed texts between defendant and Christie's phones from May 3, 2019, through July 14, 2019. On June 30, 2019, defendant texted Christie:

> I'm so hurt. I'm so hurt. Please, please, don't have any more of your dates come into our home or spend time with our kids. It's too soon. I'm hurting so bad inside that this happened. Please. I've never begged you for anything before, but I beg you not to do this. When the time comes and you find the next great one to settle down, then . . . let's talk about it again. I'm in so much pain inside. Please if you have any love left for me, don't connect anyone to our kids and our home. It's my home and my kids too, and things are moving so fast. This is all I ask of you to keep sacred for us. I will never let the kids see me with another woman until I talk with you first. I'm in so much pain from that, I'm in so much pain.

Christie responded to defendant the same day:

> I'm sorry. I never meant to hurt you. I will not bring anyone around the kids right now, if that's how you feel. Please understand, it wasn't a big thing. He came to . . . the door, was introduced as a friend, and he had a drink while I got ready and the kids played on the deck. Nobody is trying to replace you. The kids are with me 24/7. It's hard to sneak around so they don't see anyone.

Defendant replied to that message on the same day, asking Christie, "[w]hy would you hurt me like that?" and indicated she was being "insensitive" and "cruel."

A-1624-22

On July 13, 2019, at 6:12 p.m., Christie texted defendant asking if the daughter's glasses were in his car. Defendant replied at 6:16 p.m., "[y]es, she left them in the car." Approximately forty minutes later, defendant texted Christie:

> First of all, [our daughter] tells me that you are really sad about the divorce. Second, the only thing I told her about this guy Tim is not to talk to him because I don't know him and I don't want her to get attached to anyone that may be coming in and out of her life. She doesn't need more loss. The only sadness I tell her about is how sad I am when I have to leave her and that's the truth of the situation. I know you are not sad at the divorce even though she says you are. Maybe you should ask yourself why she keeps telling me that.

Christie replied to defendant roughly an hour later:

> She's probably just telling you that to make you feel better. . . . It's not okay to interrogate her when you see her. It's causing her mental trauma, and if anyone gets barred from seeing her, it will probably be you after she talks to the judge. And you should not be asking her not to speak to someone I am dating. She has barely met him, you're making her uncomfortable, and we know full well it had nothing to do with their well-being. . . . The only motivation you have behind asking her not to speak with Tim is to try to make me as unhappy of a person as you and you have admitted that yesterday. Funny thing is my happiness isn't contingent on Tim. My happiness comes from having my freedom from you. It's not something you can take away.

There were no texts between the phones on July 14, 2019.

A-1624-22

Gangi also reviewed records for the landline phone at 1 Mirror Place, defendant and Christie's house. Gangi testified there were two calls from defendant's cell phone to the landline on July 14, 2019, one call at 9:32 p.m. which was "an [eighty-eight] second call," and a second call at 11:16 p.m. which was "a zero second call."

Detective Sergeant Christina Kovacs of the Morris County Sheriff's Office processed the scene. Kovacs collected "several shell casings and . . . some swabbings of blood" from the front stoop of 5 Mirror Place. Kovacs also testified "[t]he deceased victim's body [was] located on the front step" of 5 Mirror Place. Kovacs also collected evidence from 3 Mirror Place including "some bloodstains" and video evidence.

At 1 Mirror Place, Kovacs testified there was blood on the floor in the entryway and a trail of blood going up the stairs. There was also "bloodstains on the wall" at the top of the stairs. In the hallway leading to the master bedroom, Kovacs collected three shell casings. In the bathroom, Kovacs documented "blood" on the floor and on the wall and collected "four shell casings . . . from the floor in that bathroom." The bathroom contained "holes in the wall; blood on the floor; a pair of glasses on the floor; and a bullet fragment on the floor." In the master bedroom, Kovacs "observed the door to the closet

to be off its track and had several defects in it," and "[t]here was blood on the floor as well as some other ballistics evidence, shell casings." The door frame was "damaged" and "had been broken in." Kovacs also found a landline phone in the master bedroom. Kovacs and other investigators were able to view the call log on that phone, which showed a call from defendant on "[July 14] at 9:32 p.m.," and another call from defendant on "[July 14] at 11:16 p.m."

According to William Stitt, an expert in firearms capability and comparisons, all the recovered bullets or fragments of bullets from the scene, other than two items that were inconclusive, were fired from a Sig Sauer P229. Stitt also concluded all the shell casings collected from the scene were fired "[t]hrough the Sig Sauer."

Shooting reconstruction expert Detective Sergeant Michael Abate of the Morris County Sheriff's Office determined there were "two shooting incidents" at 1 Mirror Place. Abate testified the shooter was first "present in the doorway of the bathroom on the second floor of 1 Mirror Place" and "the shooter was shooting into the bathroom, targeting the back wall." Second, the shooter was "in the bedroom to the front of the closet" and "was shooting into the closet of the bedroom." Abate testified 5 Mirror Place "was the third shooting incident that occurred." Abate determined "the shooter was located close to the porch,

standing in the doorway" of 5 Mirror Place and "was firing toward the porch area front of the house."

Bloodstain pattern analysis expert Detective Dina Gardner of the Morris County Sheriff's Office similarly concluded "[i]n the second[-]floor bathroom of 1 Mirror Place, the victim Christ[ie] Formisano sustained injuries which then resulted in blood[]shed," and the "drip stains . . . are consistent with someone being in an upright or standing position."  The "drip stains were followed from the bathroom, through that small portion of the hallway, down the stairs, out the front door . . . across the driveway of 3 Mirror Place, up the stairs, and at the front door where there was another transfer pattern on the glass storm door" of 3 Mirror Place.  The drip stains continued "down the right-hand side of the staircase at 3 Mirror Place, and then subsequently on the driveway, . . . and then the front stairs and front porch area of 5 Mirror Place, where Christ[ie] Formisano was located deceased."

Dr. Di Wang conducted Christie's autopsy.  Dr. Wang was qualified as an expert in forensic pathology and had conducted over 3,000 autopsies.  Dr. Wang concluded Christie sustained a minimum of six and a maximum of nine gunshot wounds.  She was shot in the head, chest, torso, arm, wrist, and fingers.  Dr. Wang testified the wounds to the torso and extremities were "[n]ot critically

lethal" and Christie could have survived them if she had received timely medical help. Dr. Wang stated, however, the shot to the chest would have been "almost nearly a hundred percent . . . immediately lethal" and indicated Christie died "[w]ithin minutes" of being shot in the chest. Dr. Wang determined Christie's cause of death was "multiple gunshot wounds of head, torso, and extremities" and the manner of death was "homicide." Dr. Wang also conducted a toxicology examination, which showed "no material found from that panel they tested, which are usually commonly used or abused drugs or medication."

Defendant did not testify at trial. He called one witness to support his diminished capacity defense, clinical psychologist Dr. Gerard Figurelli who issued multiple reports and conducted a psychological evaluation of defendant after interviewing him seven times and reviewing relevant documents from the State's investigatory file, including defendant's interviews and medical records. Dr. Figurelli stated he performed "[t]housands" of psychological evaluations and was qualified as an expert in clinical psychology.

According to Dr. Figurelli, defendant had "a major depressive disorder" and "post[-]traumatic stress disorder" (PTSD) before the incident on July 14, 2019. He concluded this in part because defendant had appetite loss, sleep difficulties, a depressed mood, "and he was at one point experiencing suicidal

thoughts" and "had actually contacted the [c]op to [c]op suicide hotline" previously. Defendant also "was experiencing . . . a lowered sense of self[-]esteem." Dr. Figurelli testified defendant's job as a Newark police officer had contributed to his PTSD and he tended to "repress and deny" the trauma he had experienced on the job. Several assessments for measuring hopelessness, suicide, and anxiety as well as a personality assessment inventory determined defendant "was experiencing various symptoms of depression and anxiety."

In Dr. Figurelli's opinion, on July 14, 2019, defendant had "an acute dissociative reaction to a stressful event." Dr. Figurelli stated such a reaction can "elicit[] within the individual a very powerful and . . . extreme[] emotional reaction." He testified defendant went into a "dissociative episode" when defendant indicated he "snapped and . . . blacked out." In a dissociative episode, Dr. Figurelli stated a person is "not able to engage in the type of rational control and rational regulation of their behavior as they otherwise might if they were simply angry and had not entered into a dissociative state." Further, there is a "disconnection between reason and emotion" and a "lack of . . . agency" over one's behavior. According to Dr. Figurelli, defendant's preexisting conditions "left [defendant] particularly vulnerable" to a dissociative episode. Dr. Figurelli opined due to the dissociative state defendant was in during the incident on July

14, 2019, he could not have "act[ed] in a purposeful, knowing, and reckless manner."

The State presented a rebuttal expert, Dr. Louis Schlesinger, who was qualified as an expert in forensic psychology, has been a forensic psychologist for forty-six years, and conducted a forensic examination of defendant, including two interviews. He reviewed Dr. Figurelli's report and similar documents to Dr. Figurelli, including police reports, interviews, witness statements, defendant's Ann Klein records, and other medical records. Dr. Schlesinger indicated during the interviews defendant was "friendly," "pleasant," "engaging," and "very polite." He also administered various psychological tests on defendant.

The personality test Dr. Schlesinger administered indicated defendant was "mildly depressed" and had "inner tension and anxiety," "repressed anger," and "low self[-]esteem or feelings of inadequacy." Dr. Schlesinger found defendant had "[o]ther [s]pecified [d]epressive [d]isorder with anxiety or anxious distress," which is "a reactive depression basically" and was largely due to defendant's divorce. Dr. Schlesinger testified this disorder was "on the more mild end" and many of defendant's reported symptoms, such as sadness, insomnia, poor appetite, and weight loss, helped him come to this conclusion, although

Schlesinger noted defendant's symptoms are "to be expected of almost everybody who's going through a divorce." He concluded at the time of the July 14, 2019 incident, defendant was depressed. Dr. Schlesinger also found defendant had "mild compulsive traits."

Dr. Schlesinger also found defendant had an "acute dissociative reaction to a stressful event" on July 14, 2019, triggered by the shootings, which included "dissociative symptoms" and "depersonalization and derealization." According to Dr. Schlesinger, both depersonalization and derealization "are common symptoms in the general population" and are a reaction to violent behavior. Dr. Schlesinger found defendant's reported symptoms of feeling surreal and watching himself over his shoulder during the July 14, 2019 incident were "mild symptoms" of depersonalization and derealization.

In his opinion, "[s]o many of those actions that [defendant] did were intentional, they were purposeful." For example, Dr. Schlesinger believed defendant following Christie from the house at 1 Mirror Place to neighbor's houses was "highly intentional. That's not just having mental intent, that's having intent and physically going, trying to reach your goal, your intended goal." Further, defendant's conversation with Sole that he was "doing busy work" and "[l]eaving the crime scene shows consciousness of guilt and an

30

awareness of wrongfulness in your behavior." Overall, he opined defendant "clearly could form purposeful, intentional intent, and he was totally aware and had knowledge of what he was doing before, during, and following the homicide."

## II.

Defendant argues in his first point the judge failed to provide the jury with meaningful guidance when it asked for clarification and a clear definition of passion/provocation manslaughter. We are not persuaded.

At the charge conference, defendant requested the jury be instructed on passion/provocation manslaughter as a lesser included offense to murder and contended there was "a rational basis for it to be presented" to the jury. The State "completely disagree[d] that this is a passion/provocation case, but that's not the standard." The State ultimately "agree[d]" with defendant stating, "where the defendant asks for the jury to be instructed on it" the judge should give the charge. The trial court was not sure passion/provocation applied because "rage, emotion alone, is not enough." The judge allowed defendant to draft and propose a passion/provocation instruction, but he "s[aw] some real issues with it." Ultimately, the judge told defendant the charge would likely be included in the jury instructions since "the State tends to agree with you."

31

The judge accordingly instructed the jury on purposeful and knowing murder and on the lesser included offense of passion/provocation manslaughter. During deliberations, the jury sent out a note requesting a "clear definition of passion and provocation." In response, the judge stated, "I would be inclined to explain to them that I cannot expand or give them any different definition of passion/provocation than that which I gave them in the jury instructions," and the judge indicated he "would be happy to read it for them again if they would prefer to hear it read out loud." The State thought "it would make sense for the [c]ourt to read it again" even though the jury had a copy of the charge. Defendant "agree[d] with the State that respectfully we would ask your Honor to read it to them."

The trial court brought the jury back out and told them, "I am not able to expand or differentiate from the instruction that I gave you previously with respect to passion/provocation. However, I am going to read it for you again." The judge then reread the charge on passion/provocation which tracked the Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter" (rev. June 8, 2015). Defendant did not object.

Appropriate and proper jury instructions are essential for a fair trial. State v. Scharf, 225 N.J. 547, 581 (2016). When a defendant alleges error in the jury charge, the charge must be reviewed as a whole. State v. Loftin, 146 N.J. 295, 379 (1996). Instructions given in accordance with the model jury charge, or which closely track the model jury charge, are generally not considered erroneous. State v. Ramirez, 246 N.J. 61, 70 (2021). However, "[a]n erroneous jury charge 'when the subject matter is fundamental and essential or is substantially material' is almost always considered prejudicial." State v. Maloney, 216 N.J. 91, 104-05 (2013) (quoting State v. Green, 86 N.J. 281, 288 (1981)).

It is firmly established that "[w]hen a jury requests clarification," the trial court "is obligated to clear the confusion." State v. Conway, 193 N.J. Super. 133, 157 (App. Div. 1984). "An appropriate judicial response requires the judge to read the question with care to determine precisely what help is needed." State v. Parsons, 270 N.J. Super. 213, 221 (App. Div. 1994). While such help "ordinarily requires explanation beyond rereading the original charge," Pressler & Verniero, Current N.J. Court Rules, cmt. 7 on R. 1:8-7 (2024), "many times it is entirely appropriate" for the trial judge to reread the model jury charge, State v. Berry, 254 N.J. 129, 146 (2023). There is no requirement that the judge

reread the entire charge when the jury requests specific definitions, and "[t]he failure of the jury to ask for further clarification or indicate confusion [after readback of the jury charge] demonstrates that the response was satisfactory." State v. McClain, 248 N.J. Super. 409, 421 (App. Div. 1991).

Because defendant did not object to the judge's decision regarding the jury note, we address it under the plain error standard. See R. 2:10-2.; State v. Clark, 251 N.J. 266, 286-87 (2022). That standard requires us to determine: "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' R. 2:10-2; that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Dunbrack, 245 N.J. 531, 544 (2021) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)). "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'" Clark, 251 N.J. at 287 (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)).

We are convinced the judge did not commit error, let alone plain error, in the manner in which he responded to the jury's note. The jury asked for the definition of passion/provocation, and the judge reread the jury charge which defined and described passion/provocation manslaughter. In doing so, the

34

judge's instruction tracked the model charge verbatim. The judge's rereading the model charge in response to the jury's note was "entirely appropriate." Berry, 254 N.J. at 146; see State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) ("[A] jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough.'" (quoting State v. R.B., 183 N.J. 308, 325 (2005))); Ramirez, 246 N.J. at 70 (same). Our courts have found that rereading the model charge is often sufficient in response to questions from the jury about definitions or other legal questions. See State v. Gorthy, 226 N.J. 516, 540-41 (2016) (rereading relevant statutes and elements of offense constituted no error in response to legal questions by the jury); State v. Scher, 278 N.J. Super. 249, 271 (App. Div. 1994) (finding no error when the judge "repeat[ed] the instructions previously given" when the jury asked about the distinction between reckless manslaughter and death by auto and asked for the definition of "casual drinking" because it "could think of no more meaningful way to apprise the jury of the applicable legal principles").

Further, once the judge reread the charge to the jury, they did not ask for further clarification, "demonstrat[ing] that the response was satisfactory." McClain, 248 N.J. Super. at 421. We also note the model jury charge does use

examples. For example, the judge instructed the jury, "words alone do not constitute adequate provocation" but "a threat with a gun or knife or a significant physical confrontation might be considered adequate provocation."

We also reject defendant's argument the judge was obligated to have tailored the supplemental instruction to the facts of the case. We have found in certain circumstances a court is required to "mold" the model jury charge to the facts of a case when it includes a "statement of relevant law" which, "when divorced from the facts, was potentially confusing or misleading to the jury." Cotto, 471 N.J. Super. at 543 (quoting State v. Robinson, 165 N.J. 32, 42 (2000)). Tailored instructions may also be useful "in a protracted trial with conflicting testimony." State v. Concepcion, 111 N.J. 373, 380 (1988). We have "emphasize[d]," however, "there is no principle requiring that in every case a court must deliver a specifically tailored instruction relating . . . the facts of the case to the applicable law." Cotto, 471 N.J. Super. at 544 (quoting State v. T.C., 347 N.J. Super. 219, 240 (App. Div. 2002)). "When the facts are neither complex nor confusing, a court does not have to provide an intricate discussion of the facts in the jury charge." Ibid.

The facts presented to the jury were neither confusing nor intricate and there was no "conflicting testimony." Concepcion, 111 N.J. at 380. Rather, the

testimony was straightforward and corroborated by multiple eyewitnesses, video surveillance, shooting reconstruction and bloodstain analysis, and defendant's own statement to police that defendant went to his house on July 14, 2019, deduced that Christie had a man in her bedroom, and subsequently began shooting, injuring Simonson and eventually killing Christie after tracking her to the neighbor's house. These are unlike the complex facts in Berry, relied upon by defendant, which involved the trial of three leaders of a multi-level narcotics trafficking network and which necessitated a tailored instruction as to each defendant's supervisory role in the network. 471 N.J. Super. at 114-15. Simply put, there was no need for the trial court to have "provide[d] an intricate discussion of the facts in the jury charge." Cotto, 471 N.J. Super. at 544.

Moreover, defendant did not object to the judge rereading the charge, but instead "agree[d]" to that course of action, thus "there is a presumption that the charge was not error and was unlikely to prejudice . . . defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017). Defendant also did not request tailoring instructions at the charge conference and did not request tailoring for the readback after the jury's note. Ultimately, there is nothing to show that the judge rereading the model jury charge on passion/provocation manslaughter in

response to the jury's note was "clearly capable of producing an unjust result." R. 2:10-2.[3]

## III.

Defendant argues in his second point the official misconduct charge should have been dismissed pre-trial because the State failed to present prima facie evidence to the grand jury that defendant committed an act related to his role as a police officer. Again, we disagree.

Gangi was the only witness the State presented to the grand jury. He testified consistent with the evidence adduced at trial regarding the shootings of Christie and Simonson. With respect to official misconduct, Gangi stated he was aware defendant was a Newark police officer at the time of the shootings, had served in that role for twenty-four years, and was soon to be promoted to lieutenant. He also testified Nancy stated she saw defendant from her bedroom window and "explain[ed] that he was dressed in a dark police uniform[,] and he was shooting a black handgun in the direction of her front door" at 5 Mirror Place. Gangi also testified that Sole had indicated that after he heard shots, he

---

[3] In light of our conclusion the court committed no error when it instructed and re-instructed the jury, we do not address the State's alternative argument there was no rational basis in the record for a passion/provocation charge or conviction.

opened his door and saw defendant "walk across his front lawn dressed in his . . . full police uniform." Gangi further indicated Simonson had described the shooter as "wearing a dark blue or black police uniform with yellow trim."

He further confirmed several nine-millimeter spent cartridge casings were located at the scene and police later located a Sig Sauer Model P229 nine-millimeter pistol in defendant's trunk after he had been located following the incident. He testified the pistol "was assigned by the Newark Police Department as [defendant's] duty firearm" and further stated testing of the spent cartridges from the scene revealed all "were discharged" from defendant's "duty-issued firearm." Gangi also testified as to General Order 18-22 promulgated by the Newark Police Department, which "imposes [a] requirement that members ensure that the use of division-authorized firearms do not pose a substantial risk of injury to innocent persons." The grand jury returned an indictment charging defendant with second-degree official misconduct and that defendant "being a public servant, that is, a law enforcement officer . . . act[ed] with a purpose to obtain a benefit for himself" and committed acts relating to his public office by "utilizing his duty-issued firearm in an unauthorized manner during the commission of and attempt to commit a crime(s)."

The motion judge denied defendant's application and explained the reasons for his decision in a comprehensive written statement of reasons. The judge explained the "State has provided evidence that [defendant] was representing himself as a police officer while allegedly perpetrating a crime." Specifically, defendant "was wearing his full police uniform, thereby representing himself as a police officer, and discharging his duty-issued firearm." The judge concluded "it is entirely reasonable that the grand jurors may have inferred that these potential witnesses saw a police officer acting in his capacity as an officer of the law," and acknowledged the State alleged defendant used his duty-issued firearm "in the commission of the crimes in violation of" General Order 18-22. He thus found, "viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, the [c]ourt finds that the State has submitted some evidence that [d]efendant committed an act relating to his office knowing it was unauthorized."

The judge ultimately found "the grand jury could reasonably infer based on the evidence submitted by Detective Gangi that [d]efendant's actions were connected to his official duties as a police officer," and "could reasonably infer based on the evidence that [d]efendant's actions made calculated use of his office

to avoid suspicion."  The court thus found that "a prima facie case of [o]fficial [m]isconduct has been established and the indictment is not palpably defective."

A trial court's decision denying a defendant's motion to dismiss a count of the indictment is reviewed for an abuse of discretion.  State v. Saavedra, 222 N.J. 39, 55 (2015).  "A trial court's exercise of this discretionary power will not be disturbed on appeal unless it has been clearly abused."  Id. at 55-56 (quoting State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994)).  Our Supreme Court has "stressed that a court should dismiss an indictment 'only on the clearest and plainest ground,' and only when the indictment is manifestly deficient or palpably defective."  State v. Twiggs, 233 N.J. 513, 531-32 (2018) (quoting State v. Hogan, 144 N.J. 216, 228-29 (1996)).

A trial court deciding a motion to dismiss an indictment determines "whether, viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it."  State v. Morrison, 188 N.J. 2, 13 (2006).  A court "should not disturb an indictment if there is some evidence establishing each element of the crime to make out a prima facie case."  Id. at 12.

The indictment charged defendant with second-degree official misconduct pursuant to N.J.S.A. 2C:30-2(a), which provides:

> A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
>
> > a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner . . . .

"[T]he crime of official misconduct has three elements: (1) the defendant is a public servant, (2) who committed an act relating to his office, (3) with purpose to benefit himself or deprive another of a benefit." State v. Bullock, 136 N.J. 149, 153 (1994). Only the second element is at issue here.

A "defendant's oath as a police officer to defend and obey the laws of New Jersey, in of itself, does not make him strictly liable for official misconduct for all crimes he may commit." State v. Kueny, 411 N.J. Super. 392, 405 (App. Div. 2010). Rather, "the misconduct must somehow relate to the wrongdoer's public office." Id. at 407. "[A]n act 'sufficiently relates' to law enforcement officers' public office when they 'commit an act of malfeasance because of the office they hold or because of the opportunity afforded by that office . . . .'" Saavedra, 222 N.J. at 61 (quoting Bullock, 136 N.J. at 157) (second alteration in original).

Our courts have also found official misconduct charges can be based on conduct while off duty.  See, e.g., State v. Johnson, 127 N.J. 458, 486-87 (1992) (concluding an off-duty state trooper could be found to have committed official misconduct when he donned his uniform and feigned a drug arrest to take the drugs to resell); Bullock, 136 N.J. at 151-52 (finding a temporarily suspended officer involved his office and was guilty of official misconduct when he represented himself as a police officer while perpetrating a crime); Moore v. Youth Corr. Inst., 119 N.J. 256, 270 (1990) (finding an off-duty corrections officer who trespassed onto his supervisor's property to commit a harassing act committed an act that "involved and touched" his employment).  Our Supreme Court in State v. Hinds noted that "[t]he acts of the off-duty officers in Johnson and Bullock were sufficiently related to the officers' official status to constitute official misconduct because they made calculated use of an office to avoid suspicion and to instill in unsuspecting victims a false sense of security."  143 N.J. 540, 546 (1996).

Further, this court has found an off-duty officer acts in a manner "directly involv[ing] and touch[ing] upon his employment" when he "display[s] his police badge and use[s] his service revolver in the incident that formed the basis for his aggravated assault conviction."  State v. Williams, 355 N.J. Super. 579, 585

43

(App. Div. 2002). The court found the defendant in <u>Williams</u> "was lawfully carrying the weapon, whose unlawful use constituted a fourth-degree aggravated assault, only by virtue of his employment as a police officer." <u>Ibid.</u> While <u>Williams</u> involved the forfeiture-of-public-office statute rather than official misconduct, that statute, while not identical to official misconduct, similarly requires the public servant to be "convicted of an offense involving or touching such office, position or employment." N.J.S.A. 2C:51-2(a)(2).

We are satisfied the motion judge did not abuse his discretion in denying defendant's motion to dismiss the official misconduct charge. Gangi presented evidence to the grand jury that defendant came to his former residence on July 14, 2019, dressed in his full police uniform, and discharged his duty-issued weapon when he shot Christie and Simonson.

He further correctly informed the grand jurors that several neighbor witnesses saw defendant tracking Christie to 3 and 5 Mirror Place wearing a dark blue police uniform, and that many of these neighbors knew defendant was a police officer. The grand jury could have reasonably believed these witnesses may have heard gunshots and then seen defendant in his police uniform, without a covering as was his custom upon completing his shift, and thought defendant was acting in his official capacity. Furthermore, they could have reasonably

44

believed from Gangi's testimony defendant used his police uniform to make "calculated use of [his] office to avoid suspicion and to instill in unsuspecting victims a false sense of security" from these witnesses. Hinds, 143 N.J. at 546. On this point, we note Gangi stated defendant told Sole, who had heard the gunshots and asked defendant what was going on, that he was just "doing busy work," feigning innocence and providing Sole with a "false sense of security." Hinds, 143 N.J. at 546.

We reject defendant's argument the grand jury "determined that the [S]tate did not present sufficient evidence that [defendant] used his uniform in an unauthorized manner, and returned the indictment only on the gun claim." The record reflects the State presented its official misconduct charge to the grand jury based on both defendant's use of his police uniform and duty-issued weapon in an unauthorized manner. We discern nothing in the grand jury proceedings to suggest they rejected any part of the State's theory.

Further, Gangi also presented evidence to the grand jury defendant used his duty-issued weapon to kill Christie and injure Simonson. He further testified as to General Order 18-22, which "imposes the requirement that [Newark police officers] ensure that the use of division-authorized firearms do not pose a substantial risk of injury to innocent persons." While off duty, defendant had

the weapon he used to commit the charged crimes "only by virtue of his employment as a police officer," Williams, 355 N.J. Super. at 585, and "because of the opportunity afforded by" the Newark Police Department, Saavedra, 222 N.J. at 61, and he knowingly used it in an unauthorized manner when he shot Christie and Simonson. Thus, as the motion judge correctly found, testimony from the grand jury proceeding, when viewed in a light most favorable to the State, supported the conclusion the State presented "some evidence" defendant committed an act related to his public office as a police officer and that he knew it was unauthorized. Morrison, 188 N.J. at 12.[4]

IV.

In point three, defendant argues the motion court erred in failing to suppress his statements to police, including when he told Kelly during the roadside interaction that his gun was in the trunk of his car, those he made to Kelly in transport to the Livingston police station, and statements he made in

---

[4] Finally, we note a subsequent finding of guilt by a properly instructed jury "represents a finding beyond a reasonable doubt that defendant[] w[as] guilty of the offense." State v. Ball, 268 N.J. Super. 72, 120 (App. Div. 1993). Thus, errors or "procedural irregularities in a grand jury proceeding are rendered harmless where defendant is ultimately found guilty by petit jury." Warmbrun, 277 N.J. Super. at 60 (quoting Ball, 268 N.J. Super. at 120). Therefore, since defendant does not challenge the jury verdict or charge of official misconduct, we conclude any alleged errors which occurred at the grand jury proceedings are rendered harmless.

his formal interview with Puskas at the Jefferson Township police station. We have considered all of these arguments and find them to be without merit.

Prior to trial, the State moved to admit defendant's statements made to police and defendant moved to suppress them. Kelly and Puskas testified at the suppression hearing.

Kelly testified he was advised on July 15, 2019, there was "a possible homicide in Jefferson" and the suspect's "cell was getting pinged" in Livingston. He testified he stopped a white Mazda, on July 15, 2019, near Heritage Middle School. The car had a single occupant, who Kelly identified at the hearing as defendant. Kelly stated after he conducted the stop, police removed defendant from his car, conducted a pat-down search, handcuffed him, and placed him in Kelly's car. Kelly recalled defendant was complaining about his handcuffs being too tight, so he "removed him . . . out of the vehicle and adjusted them accordingly." When he did that, Kelly "did a secondary search . . . for any weapons, asked him if he had any weapons on him, and then [he] cuffed him, double locked, and placed him into the back of [his] vehicle." Kelly indicated he was aware at the time defendant was a Newark police officer, and he was aware police officers typically carry a weapon as part of their uniform.

A-1624-22

The MVR recording from Kelly's car was played at the hearing.[5] At the roadside stop, once officers had handcuffed defendant, an unidentified officer stated, "[w]e're not going to go through [defendant's] car, apparently he says he's got a weapon in the car." While adjusting defendant's handcuffs, and without administering any <u>Miranda</u> warnings to defendant, Kelly asked defendant, "[d]id you get off the job today?" Defendant replied, "[y]eah, I went home from work and I came home and found my wife in bed with another guy." Kelly then asked defendant, "Ok. Is the gun that you used in the car?" to which defendant replied, "[i]t's in the trunk." Kelly testified officers searched defendant three times and he had no weapons on him before he asked defendant about the whereabouts of the gun. He stated he only asked defendant about the gun "for officer safety." Kelly did not recall that another officer had said defendant had indicated the gun was in his car, but he nonetheless stated "[s]ome officers carry multiple weapons or multiple handguns."

Before Kelly transported defendant to the Livingston police station, he administered defendant <u>Miranda</u> warnings. Kelly indicated he advised defendant of those rights "from memory." The MVR recording evidenced Kelly telling defendant, "[a]ll right, so, you obviously know what happened so, you

---

[5] We cite to the transcript of the MVR recording included in the appendix.

have the right to remain silent, anything you say or do can be used against you in a court of law.  You have a right to an attorney[,] if you can't afford one, one will be appointed to you."  Kelly asked, "[d]o you understand your rights as they have been read to you?" and defendant replied, "[m]m-hmm."

Kelly also testified at the hearing defendant made statements to him in transport to the Livingston police station, as noted above.  Specifically, Kelly recalled defendant "asked if [Kelly] thought he was pitiful" and "said that he saw his wife in bed with another man."  Kelly stated he did not ask defendant any questions in transport and "just responded to whatever he was either asking or telling me."  Of import, the MVR recording depicted defendant asking Kelly if he thought he was "pitiful" and Kelly responded, "I don't.  I just think you need help."  Defendant then told Kelly:

> [Defendant]:  I've been a cop for [twenty-four] years, man.
>
> [Kelly]:  Yeah.
>
> [Defendant]:  Never
>
> [Kelly]:  Your boys are looking for you, man.
>
> [Defendant]:  I never shot anybody before.  . . . I filed for divorce like two weeks ago.  My mother lives in town.
>
> [Kelly]:  Yeah. . . .

49

[Defendant]: Yeah. If you get a chance, just you know, let her know . . . she'll worry.

[Kelly]: We will.

[Defendant]: I'd never hurt the kids, I can't believe (unintel[ligible])

[Kelly]: Ok.

[Defendant]: It happened so fast.

[Kelly]: Yeah.

[Defendant]: Walked in, I had my uniform on, gun on, you know . . . my daughter left her glasses in the car, you know?

[Kelly]: Yeah.

[Defendant]: So I went out there to just return the eyeglasses at the house, and right on, you know. Right on my bed, man. Right, right in my bedroom.

[Kelly]: Yeah.

[Defendant]: Thanks for listening, bro. I appreciate it.

[Kelly]: Yeah, man.

Puskas also testified at the suppression hearing regarding defendant's formal interview. Puskas testified he "was not aware of any statements" defendant had made to police prior to interviewing him. Puskas indicated defendant was not restrained in any way during the interview. He stated he

50

advised defendant of his <u>Miranda</u> rights using a form from the prosecutor's office. Puskas testified defendant circled "yes" and initialed each of the questions on the form, including that he understood each of the rights explained to him and that he wished to speak to police. Puskas stated they took a break during the statement and defendant was given water and a blanket during the interview. Puskas testified defendant's demeanor was "very quiet" and "almost solemn" during the interview.

The first twenty-five minutes of defendant's interview with police were played at the hearing and entered into evidence. In the interview, Puskas read defendant his <u>Miranda</u> rights. He asked defendant, "[d]o you understand these rights that I have . . . explained to you?" to which defendant responded, "[y]es" and circled that on the <u>Miranda</u> form. After Puskas read defendant his <u>Miranda</u> rights, he asked:

> [Puskas]: Okay. Having these rights in mind, do you wish to speak to us now?
>
> [Defendant]: I want to, but it's not in my best interest.
>
> [Puskas]: I'm sorry. Say it again.
>
> [Defendant]: I want to, but it's probably not in my best interest.

[Puskas]: Well, you tell me what you want to do, because you can, as I said to you, you can stop at any time.

[Defendant]: I know that.

[Puskas]: Okay.

[Defendant]: I know. Okay.

[Puskas]: But as long as you understand. I know you've done this before yourself.

[Defendant]: Yeah.

[Puskas]: So, uh, that I can't tell you what to do.

[Defendant]: I want to help but it, it was, it was crazy.

[Puskas]: I'm sorry.

[Defendant]: It was crazy. It was crazy.

[Puskas]: It was crazy, you said?

[Defendant]: It was crazy. I never even have been involved in a domestic before, let alone this.

[Puskas]: Well, as I said, I, I will, I will talk to you. You can stop at any time, if you desire to. Okay.

[Defendant]: Okay.

[Puskas]: And we'll just stop.

[Defendant]: Okay.

A-1624-22

[Puskas]: So again, are you willing to . . . talk with us now?

[Defendant]: Okay.

[Puskas]: Okay. So just put yes here and your initials next to that yes and next to the other yes. Okay. . . . Could you print your name right there and then sign right there.

[Defendant]: Okay.

The motion judge granted in part and denied in part defendant's motion. Regarding the statements defendant made to Kelly during the roadside stop, the judge found it was clear during that questioning defendant "was not free to leave" since he had already been arrested and handcuffed and was thus in custody. He also found when Kelly asked defendant whether he just got off work and where the gun was, "his questions were reasonably likely to elicit an incriminating response, as . . . Kelly knew [d]efendant was [a] Newark [p]olice [o]fficer and a suspect in a murder investigation," and thus defendant "was subject to custodial interrogation at the time he made statements" to Kelly during the roadside interaction.

However, the judge found defendant's "statements regarding the whereabouts of the weapon [were] still admissible under the public safety exception to the <u>Miranda</u> requirements." He found when Kelly asked where the

gun was, "the police officers were confronted with the necessity of ascertaining the whereabouts of a dangerous weapon that they believed [d]efendant had possessed earlier in the evening" and "[o]fficers suspected that [d]efendant used the gun to fatally shoot his wife . . . and seriously wound [Simonson]."

The judge also concluded Kelly "testified that he asked the question for officer safety reasons." Further, while the judge noted the MVR recording detailed an unknown officer stating that defendant had said the gun was in his car, "Kelly testified that some officers carry multiple weapons" and "several hours had passed since the alleged shooting" when defendant was stopped by police, and "[t]he location of the weapon that [d]efendant allegedly used was unknown to . . . Kelly at that time, and to his knowledge, it could have been accessible by [d]efendant and/or a member of the public." Under those circumstances, the court found "there was an objectively reasonable need to protect the police and the public from an immediate danger associated with the weapon" and "[t]he limited questioning of [d]efendant was designed to secure the safety of the police officers and the public, and . . . [d]efendant's response only pertained to the whereabouts of the gun." Thus, the court found defendant's statement the gun was in the trunk of his car was admissible.

However, the court found "the question posed by . . . Kelly in regard to whether [d]efendant 'got off the job' that day is not related to the danger associated with a weapon, nor was it reasonably necessary to secure public safety." The judge found that question and defendant's answer to it—that he went home and found his wife in bed with another man—were inadmissible. Further, the judge noted, although Kelly did advise defendant of his <u>Miranda</u> rights before transporting him to the Livingston police station, he did not tell defendant he could exercise his rights at any time and thus the <u>Miranda</u> warnings administered by Kelly during the roadside interaction were insufficient. Nonetheless, the court found "[d]efendant did not make any statements during the roadside interaction after he was advised of his rights."

Regarding defendant's statements to Kelly in transport to the Livingston police station, the judge also found defendant was "in custody" at that time, "[h]owever, the proofs establish that the officers did not say anything to elicit an incriminating response from [d]efendant or to place [d]efendant under compulsion to speak." Rather, the judge found "[d]uring the transport, it was [d]efendant himself that initiated a conversation with . . . Kelly." Also, while the judge found that Kelly "acknowledge[d] [d]efendant's statements," "his responses were not 'reasonably likely to elicit an incriminating response.'" The

judge therefore found those statements "are admissible as spontaneous statements."

With respect to defendant's formal interview with Puskas, the judge found "[a]t no point did [d]efendant indicate that he would not make a statement or that he would like the questioning to stop" when he told Puskas he wanted to talk but it was likely not in his best interest. The judge found that statement from defendant was "equivocal," and Puskas properly clarified "whether the suspect intended to invoke his right to remain silent" and "told [d]efendant to tell him what he wanted to do and that he could stop the interview at any time." The judge also noted defendant said "[o]kay" when Puskas again asked him if he wanted to speak to police and defendant circled "yes" on the Miranda form.

The court further found defendant "had twenty-four years of law enforcement experience when he made the above-mentioned statements" and "was familiar with his constitutional rights." Further, "the officers made efforts to make [d]efendant comfortable by offering him water and a blanket at the station." The judge found defendant was read each of his Miranda rights and indicated he understood them and "further indicated in writing that he wished to speak to . . . Puskas, having these rights in mind." The judge concluded "[t]here is nothing in the record to suggest [d]efendant was forced, threatened, or coerced

56

into making a statement at any time." He accordingly found "[d]efendant knowingly, intelligently, and voluntarily waived his Miranda rights" and the first twenty-five minutes and fifty-five seconds of defendant's formal interview with police were admissible.

Appellate review of a decision on a motion to suppress is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). "Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. S.S., 229 N.J. 360, 374 (2017)). The appellate court gives deference to those factual findings in recognition of the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). The reviewing court "ordinarily will not disturb the trial court's factual findings unless they are 'so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Gamble, 218 N.J. 412, 425 (2014)). However, legal conclusions to be drawn from those facts are reviewed de novo. State v. Radel, 249 N.J. 469, 493 (2022).

The Fifth Amendment of the United States Constitution and New Jersey's common, statutory, and evidentiary law provide a right against self-incrimination. A.M., 237 N.J. at 396; see also N.J.R.E. 503; N.J.S.A. 2A:84A-19. In Miranda, 384 U.S. at 467, the United States Supreme Court developed certain safeguards to ensure a person subject to police interrogation understands the right against self-incrimination and has a "meaningful opportunity" to exercise it. State v. Nyhammer, 197 N.J. 383, 400 (2009). Pursuant to those Miranda safeguards, individuals in custody must be warned prior to any questioning that they have the right to remain silent, anything they say can be used against them in a court of law, they have the right to the presence of an attorney, and if they cannot afford an attorney, one will be appointed for them prior to any questioning if they want an attorney. 384 U.S. at 479.

"The Miranda rule does not come into play unless a statement is the product of custodial interrogation." State v. Elysee, 159 N.J. Super. 380, 387 (App. Div. 1978); Ahmad, 246 N.J. at 610. Whether an individual is in custody for Miranda purposes "is a fact-sensitive inquiry" and "[t]he critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect,

A-1624-22

and other such factors." Ahmad, 246 N.J. at 611 (quoting State v. P.Z., 152 N.J. 86, 103 (1997)). "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." State v. Hubbard, 222 N.J. 249, 267 (2015) (alterations in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).

A. Defendant's Statements During the Roadside Interaction

Defendant argues the judge erred in finding defendant's statement to Kelly that his gun was in the trunk of his car was admissible under the public safety exception. We are not persuaded.

"The public safety exception to the requirement of giving a Miranda warning prior to interrogation was first recognized by the United States Supreme Court in New York v. Quarles, [467 U.S. 649 (1984)]." State v. Melendez, 423 N.J. Super. 1, 23 (App. Div. 2011). "This exception allows police to question an accused, prior to giving Miranda warnings, when there is a public safety concern." Ibid. Our Supreme Court adopted the public safety exception in State v. O'Neal, holding that the questioning of a suspect prior to the administration of Miranda warnings was acceptable when the situation presented an

"objectively reasonable need to protect the police or the public from any immediate danger associated" with a weapon. 190 N.J. 601, 618 (2007) (quoting Quarles, 467 U.S. at 659 n.8).

To establish the exception applies, the "State must generally demonstrate (1) there was an objectively reasonable need to protect the police or the public; (2) from an immediate danger; (3) associated with a weapon; and that (4) the questions asked were related to that danger and reasonably necessary to secure public safety." Melendez, 423 N.J. Super. at 24 (quoting State v. Stephenson, 350 N.J. Super. 517, 525 (App. Div. 2002)). "Application of the public safety exception generally requires a concern for the protection of the public at large, or an extended group of individuals, such as children." Ibid.

We are convinced the trial judge did not abuse his discretion in finding defendant's statement about the whereabouts of the gun was admissible under the public safety exception. As the judge found, defendant was handcuffed at the time Kelly asked him about the gun, thus he was in custody for Miranda purposes. Ahmad, 246 N.J. at 611. Further, asking defendant where the gun was, which was suspected to be the murder weapon, was "reasonably likely to elicit an incriminating response from the suspect," Hubbard, 222 N.J. 249, 267,

thus he was also subject to interrogation. When he asked about the location of the gun, Kelly had not administered any <u>Miranda</u> warnings to defendant.

The judge's finding the public safety exception applied is supported by the record. <u>A.M.</u>, 237 N.J. at 395. Before officers located defendant, they knew he was a suspect in a homicide, and he had left the crime scene and had been driving around. Once they found defendant, multiple searches of him did not reveal the gun. Further, it is important to note defendant was stopped near a local middle school, where the gun could have been found by a child or any other member of the public if it had been discarded there. Kelly did not know where the gun was when he questioned defendant, thus, the gun could have been accessible by defendant or another member of the public and gave rise to "a concern for the protection of the public at large." <u>Melendez</u>, 423 N.J. Super. at 24. These circumstances presented the police with an "objectively reasonable need to protect the police or the public from any immediate danger associated" with a weapon. <u>O'Neal</u>, 190 N.J. at 618.

While defendant contends another officer stated defendant told the police the gun was in his trunk, as Kelly testified, officers sometimes carry multiple weapons, and the judge credited that testimony and explanation. On this point, it is significant to note Kelly ultimately did not know the whereabouts of the

gun when he questioned defendant, and the record supports the notion he asked about the gun to preserve officer and public safety, as he testified. Moreover, Kelly's question was solely related to the location of the gun "to secure public safety," not designed to elicit further incriminating responses from defendant about other topics. Melendez, 423 N.J. Super. at 24; see State ex rel. A.S., 227 N.J. Super. 541, 543, 548 (App. Div. 1988) (applying the public safety exception where police asked an unwarned suspect about a gun's location after he was seen firing it in a residential neighborhood and a pat-down did not reveal the gun and when the questioning and responses by the defendant "pertained only to the whereabouts of the gun"). As further support for our conclusion the court correctly applied the public safety exception, we note the judge properly suppressed defendant's comment to Kelly he "went home from work and [he] came home and found [his] wife in bed with another guy" as not related to public safety, or any other exception, and made without being administered proper Miranda warnings.

Defendant's reliance on Stephenson is misplaced as that case is factually distinguishable. The officers in Stephenson did not know if the defendant even possessed a gun at all. 350 N.J. Super at 524. Here, the officers knew defendant had a gun and had used it earlier in the night to commit a potential homicide.

62

Further, while the gun ended up being in the trunk in a private location, the police at first did not have any idea where the gun was, particularly when their multiple searches of defendant failed to reveal any weapons. Further, defendant admitted he had been driving around after the shootings and could have discarded the weapon anywhere for a member of the public to potentially find. Finally, as noted, Kelly's question was narrowly tailored to locating the weapon.

Moreover, defendant failed to establish how his statement that the gun was in his trunk prejudiced him at trial or how it could have produced a different result. Even if his statement was suppressed, Bost later secured defendant's car and Goncalves searched it, including the trunk where the gun was found. Thus, even without the admission, the police would have located the gun and conducted testing on the shell casings and bullet fragments found from the scene that matched defendant's Sig Sauer P229.

B. Defendant's Statements in Transport

Defendant next argues his statements made to Kelly while in transport to the Livingston police station should have been suppressed because they were "improperly elicited through interrogation while he was in custody." We are unconvinced.

Our courts have found that statements made, even when a defendant is in custody, that are "unsolicited, spontaneous, and not made in response to 'questioning or its functional equivalent'" are "not violative of <u>Miranda</u>." <u>State v. Beckler</u>, 366 N.J. Super. 16, 25-26 (App. Div. 2004) (quoting <u>State v. Ward</u>, 240 N.J. Super. 412, 418 (App. Div. 1990)). "In the absence of interrogation, a volunteered or spontaneous remark by a suspect is admissible in evidence regardless of the absence of <u>Miranda</u> warnings." <u>Elysee</u>, 159 N.J. Super. at 387; <u>see also</u> <u>State v. Tiwana</u>, 256 N.J. 33, 45-46 (2023); <u>Ward</u>, 240 N.J. Super. at 419.

The court found defendant's statements made while in transport were admissible because they were spontaneous, and defendant initiated the conversation with Kelly. Those findings are supported by credible evidence in the record. <u>A.M.</u>, 237 N.J. at 395. At the outset, while Kelly administered defendant verbal <u>Miranda</u> warnings before transporting him to the Livingston police station, the judge found those warnings were incomplete and thus insufficient. Further, as the judge found, because defendant was handcuffed and in route to the police station, there "ha[d] been a significant deprivation of the suspect's freedom of action" and defendant was in custody for <u>Miranda</u> purposes. <u>Ahmad</u>, 246 N.J. at 611.

The transcript makes clear, however, it was defendant who initiated the conversation with Kelly and gave a series of "volunteered or spontaneous remark[s]" that were not the result of interrogation or its functional equivalent. Elysee, 159 N.J. Super. at 387. Indeed, defendant, not Kelly, initiated the conversation by telling Kelly he was going to commit suicide. Kelly's response advising defendant not to do so and that he would get him help is not something he "should [have] know[n]" would be "reasonably likely to elicit an incriminating response" about the circumstances of the alleged homicide. Hubbard, 222 N.J. at 267.

Even when defendant told Kelly he had "never shot anybody before," Kelly responded, "[y]eah" and continued to respond "[y]eah" or "[o]k" when defendant offered more details about the crime, all of which were unprompted by Kelly. Kelly's superficial responses also were not "reasonably likely to elicit an incriminating response from [defendant]." Ibid. Like in Innis, "the entire conversation" between defendant and Kelly "appears to have consisted of no more than a few offhand remarks" and the MVR recording does not depict that any of Kelly's comments "were particularly 'evocative'" such that Kelly "should have known" any of his comments were reasonably likely to elicit an incriminating response. 446 U.S. at 301-02.

We therefore reject defendant's contention Kelly "initiated and maintained an ongoing dialogue" with defendant to elicit incriminating responses from him, as belied by the audio of the MVR recording.  In that recording, it is clear defendant is the one who consistently initiates conversation with Kelly, and there are significant pauses between defendant offering more information, depicting the spontaneity and voluntariness of his statements to Kelly.  Kelly does not initiate the conversation at any point in transporting defendant to the Livingston police station, despite defendant's arguments to the contrary.  See State v. Cryan, 363 N.J. Super. 442, 453-54 (App. Div. 2003) (finding defendant's "unsolicited" incriminating statements made without Miranda warnings while in police custody were admissible when "defendant himself initiated each and every encounter with the police" and in those situations a defendant "has only himself to blame").

The MVR recording establishes Kelly did not subject defendant to "questioning or its functional equivalent," Beckler, 366 N.J. Super. at 25-26, which was made clear when defendant stated at the end of the transport, "[t]hanks for listening, bro.  I appreciate it."  That statement demonstrates defendant was the one giving unsolicited statements and Kelly was simply listening and not subjecting defendant to an interrogative technique designed to

elicit an incriminating response. As the judge found, defendant's remarks in transport were "unsolicited, spontaneous, and not made in response to 'questioning or its functional equivalent'" and thus were "not violative of Miranda." Ibid. (quoting Ward, 240 N.J. Super. at 418).

C. Defendant's Formal Interview

Defendant also maintains his statements in his formal interview with Puskas should have been suppressed because "they were the result of the two-step question-first, warn-later interrogation process." We again disagree.

Upon being advised of one's Miranda rights, a person can waive those rights, but the waiver must be "knowing, intelligent, and voluntary in light of all the circumstances" and, under New Jersey law, the prosecutor must prove those characteristics beyond a reasonable doubt. State v. Presha, 163 N.J. 304, 313 (2000); see also State v. Tillery, 238 N.J. 293, 315 (2019). To determine "whether the waiver of rights was the product of a free will or police coercion," a court considers "the totality of the circumstances." Nyhammer, 197 N.J. at 402. Factors under that test include: "suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical

punishment and mental exhaustion were involved." State v. Galloway, 133 N.J. 631, 654 (1993); see also State v. Hreha, 217 N.J. 368, 383 (2014).

The motion judge found defendant knowingly, intelligently, and voluntarily waived his Miranda rights prior to speaking to police at his formal interview at the Jefferson Township police station, and thus the statements he made during the interview were admissible. Those findings are fully supported by credible evidence in the record and are unassailable. A.M., 237 N.J. at 395.

As the judge found, Puskas read defendant each of his Miranda rights along with him using a Miranda form from the prosecutor's office, and defendant stated he understood. When asked if he wished to speak to police, defendant said, "I want to, but it's not in my best interest." That response was ambiguous at best. To that end, Puskas immediately clarified and told defendant he could not tell him what to do and he could stop talking to police at any time. See State v. Johnson, 120 N.J. 263, 283 (1990) (noting that if an invocation of the right to remain silent is ambiguous, the police "may ask questions designed to clarify whether the suspect intended to invoke his right to remain silent"). Defendant acknowledged he "kn[e]w that" and said he "want[ed] to help."

Puskas again told defendant he could stop at any time and again asked defendant whether he wanted to talk to police, to which he said, "[o]kay" and

68

then signed and initialed the <u>Miranda</u> form to waive his rights. As the judge found, there is nothing to indicate defendant did not want to talk to police, and he never stated as much. Puskas properly clarified and confirmed with defendant he could stop talking to them at any time and asked a second time whether defendant wanted to speak to police and defendant responded affirmatively. He signed and initialed the <u>Miranda</u> waiver form confirming he wanted to speak to police.

Further, as the judge also noted, defendant had been a police officer for twenty-four years, knew about his constitutional rights, and confirmed with Puskas he had administered <u>Miranda</u> warnings and conducted interviews himself. Being a police officer with more knowledge of his constitutional rights than other suspects, if defendant wanted to refuse to speak to police, he would have said so directly. Defendant had also been given water and a blanket during the interview, and there was no physical punishment or mental exhaustion involved. The totality of all these circumstances supports the conclusion defendant's waiver "was the product of a free will," <u>Nyhammer</u>, 197 N.J. at 402, and was ultimately "knowing, intelligent, and voluntary," <u>Presha</u>, 163 N.J. at 313.

Defendant also argues his statements during his formal interview should have been suppressed because they were a result of a "question-first, warn-later" interrogation in violation of State v. O'Neill, 193 N.J. 148 (2007). In O'Neill, the police questioned the unwarned defendant until he admitted to conspiring to rob a victim who was murdered. Id. at 156. After the admission, police read him his Miranda rights and resumed the interrogation without a break and without advising him his prior admission could not be used against him. Id. at 156-57. The police then had the defendant give a taped statement, which they began by "cueing [the defendant] to his earlier unwarned interrogation." Id. at 157. The police further questioned the defendant in the holding cell after the first taped statement and later obtained a second taped statement. Id. at 158-59.

Our Supreme Court held "when Miranda warnings are given after a custodial interrogation has already produced incriminating statements, the admissibility of post-warning statements will turn on whether the warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination." Id. at 180-81 (emphasis in original). In making this determination, the Court set forth the following five factors to consider:

> (1) the extent of questioning and the nature of any admissions made by defendant before being informed

of his <u>Miranda</u> rights; (2) the proximity in time and place between the pre- and post-warning questioning; (3) whether the same law enforcement officers conducted both the unwarned and warned interrogations; (4) whether the officers informed defendant that his pre-warning statements could not be used against him; and (5) the degree to which the post-warning questioning is a continuation of the pre-warning questioning.

[<u>Id.</u> at 181.]

"Under that formula . . . great weight should be given if the police informed a suspect that his admissions made prior to being given the <u>Miranda</u> warnings could not be used against him." <u>Ibid.</u> However, "the failure to give that instruction will not automatically render the defendant's post-<u>Miranda</u> statements inadmissible," and the Court made clear "that we are not pronouncing a bright-line rule." <u>Ibid.</u>

Defendant argues all five factors weigh in favor of suppression and he did not offer any information about the shootings until police questioned him. We disagree and conclude the <u>O'Neill</u> factors weigh in favor of admitting the statements.

First, in terms of the questioning before being administered <u>Miranda</u> warnings, Kelly only questioned defendant about the whereabouts of the gun, which was permissible under the public safety exception. The remainder of

defendant's statements were not made in response to interrogation but were voluntary.

Second, several hours passed between Kelly's questioning at the roadside interaction and in transport and the formal interview with Puskas. Kelly stopped defendant's car around 1:30 a.m. and brought him to the Livingston police station, while Puskas formally interviewed defendant at the Jefferson Township police station around 5:22 a.m.

Third, two different officers conducted the questioning, and there is no evidence in the transcript of defendant's formal interview Puskas was even aware of Kelly's questioning of defendant, and Puskas did not reference any of Kelly's questioning during the formal interview. In fact, Puskas testified at the suppression hearing he "was not aware of any statements" defendant had made before he interviewed him. He further testified at trial, before interviewing defendant, "all [he] knew was that somebody had been placed in custody in Livingston" "and that he was being transported to Jefferson." In that sense, as to the fifth factor, defendant's formal interview was not a continuation of Kelly's questioning, but was set forth anew, as there was no evidence Puskas knew defendant had made statements to Kelly.

Defendant bases his argument primarily on the fourth O'Neill factor, contending his formal interview was improper because he was never told the statements he made to Kelly could not be used against him. We remain unconvinced. Again, Puskas testified he was unaware defendant had made any statements to Kelly before the formal interview, so he could not have given defendant this warning. More importantly, as the O'Neill Court stated, that omission alone "will not automatically render the defendant's post-Miranda statements inadmissible." Id. at 181. Here, Puskas gave defendant his Miranda warnings before the formal interview and the totality of the circumstances indicates, as detailed above, those "warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination." Id. at 180-81.

Moreover, even if we were to indulge defendant's contentions his statements should have been suppressed, any error was clearly harmless beyond a reasonable doubt. See Tillery, 238 N.J. at 302 (noting a Miranda violation may constitute harmless error); Chapman v. California, 386 U.S. 18, 24 (1967) (expounding the "harmless beyond a reasonable doubt" standard for cases implicating constitutional error); State v. Maltese, 222 N.J. 525, 550 (2015) (applying the "harmless beyond a reasonable doubt" standard to the defendant's

73

assertion that police officers violated his <u>Miranda</u> rights in his interrogation). Defendant argues he admitted his motive and that he committed the offenses in his statements to police. Yet, even if all of defendant's statements were suppressed, the State presented independent evidence of those same circumstances clearly establishing defendant's guilt beyond any reasonable doubt.

By way of example only, the State presented Simonson who testified he had been dating Christie and the two were romantically involved on July 14, 2019, and text messages showing defendant did not want Christie to bring men to the house, providing defendant's motive. The State also presented multiple eyewitnesses who testified they saw defendant tracking Christie to 5 Mirror Place, where she died. Nancy said she saw defendant had a gun in his hand and shot it, and then he looked up at her and shot the gun several more times. Sole testified he saw defendant running across his lawn from the direction of 5 Mirror Place back toward the direction 1 Mirror Place after he had heard gunshots. Video surveillance from Sole's house showed defendant crossing Sole's property at 3 Mirror Place to follow Christie and eventually shoot her at 5 Mirror Place. Ballistics evidence confirmed all the shell casings and bullet fragments from 1 Mirror Place and 5 Mirror Place came from a Sig Sauer P229 gun, the same

model found in defendant's trunk. Thus, even without defendant's statements, the State presented a wealth of evidence pointing to defendant's guilt of the crimes charged. See Tillery, 238 N.J. at 319-20 (finding harmless any error in the admission of the defendant's statement to police because the evidence of defendant's guilt "was overwhelming").

V.

In his fourth point, defendant argues his convictions "must be reversed" because the case was investigated and prosecuted by the Morris County Prosecutor in violation of N.J.S.A. 52:17B-107(a)(2) and Attorney General Law Enforcement Directive No. 2019-4. As defendant failed to raise this argument below, despite numerous opportunities to so, we decline to address the issue as it does not "go to the jurisdiction of the trial court or concern matters of great public interest." State v. Robinson, 200 N.J. 1, 20 (2009) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)); see also State v. Souss, 65 N.J. 453, 460 (1974) (noting when defendant's argument was not "alluded to, much less squarely presented, in the courts below" it "need be given no consideration here"); Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 2:6-2 (2024) ("Issues not raised below, even constitutional issues, will ordinarily not be considered on appeal unless they are jurisdictional in nature or substantially

implicate public interest.").  Here, not only did defendant fail to address the issue at any time during the approximately three years the matter was pending, he also fails to cite any precedential authority to support the proposition the State's alleged failure to comply with N.J.S.A. 52:17B-107(a)(2) and Attorney General Law Enforcement Directive No. 2019-4 warrants reversal of his convictions.

We agree with the State the "purpose of th[e d]irective is to outline clear procedures governing such investigations [where law enforcement uses force against civilians] and to ensure that they are done fully, fairly, and independently of any potential bias."  There is absolutely nothing in the record to indicate there was any bias in the prosecution, investigation, or adjudication of defendant's case, nor, as noted, did defendant ever argue so at any time in the trial court.

Moreover, defendant was neither indicted nor tried in Essex County where he worked as a Newark police officer but instead prosecuted in Morris County. Equally as important, nothing in the record remotely supports the conclusion that defendant's indictment and prosecution by the Morris County Prosecutor, rather than the Attorney General, was in any way unfair or would have produced a different result.  Defendant was afforded all the process he was due, and was convicted by a jury who considered overwhelming evidence of his guilt for the

murder of Christie, the attempted murder of Simonson, official misconduct, the endangering charges with respect to each of his children, and hindering apprehension or prosecution.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1624-22